JOHN SUMMERFIELD

*v.*

·THE CITY OF CHICAGO.

*Opinion filed June 19, 1902.*

1. MUNICIPAL CORPORATIONS—*right of city to adopt plan for track elevation.* If a city council, acting in good faith, for the best interests of the public, in the matter of elevating railroad tracks at the junction of two streets, determines that the safety of the public will be best conserved by providing a sub-way and supporting the tracks by means of walls in the street, courts will not declare such action unauthorized merely because the plan adopted requires that the street be widened to provide requisite street facilities.

2. SAME—*what not an unlawful diversion of street.* If the safety and convenience of the public demand the adoption of a plan of track elevation which makes necessary the appropriation of portions of the street for the structure to support the tracks, such appropriation is not an unlawful diversion of the street to the use of the railroad company.

3. SAME—*when condemnation of land is not for private use.* Condemnation by a city of a strip of land to be used for street purposes, such use being rendered necessary by the occupation of a portion of the street by sub-way walls erected by a railroad company in accordance with a plan of track elevation deemed by the city to be for the public interest and safety, is not a condemnation of property for private use, even though the company bears the expense.

MAGRUDER, C. J., dissenting.

APPEAL from the County Court of Cook county; the Hon. ORRIN N. CARTER, Judge, presiding.

EDWIN BURRITT SMITH, CHARLES H. BLATCHFORD, and CLAYTON R. TAYLOR, for appellant.

CHARLES M. WALKER, and DENIS E. SULLIVAN, (CLARENCE S. DARROW, of counsel,) for appellee.

Mr. JUSTICE BOGGS delivered the opinion of the court:

On the third day of January, 1900, the city council of the city of Chicago passed an ordinance providing for the widening of Stewart avenue from the south line of Seventy-second street to a point one hundred and thirty-two feet south of the crossing of Stewart avenue and Seventy-second street. To thus widen the avenue required the extension of the avenue eastward, at the south-east corner of the intersection of the avenue and Seventy-second street, over a parcel of ground of the width of forty feet at the north end and of the width of about ten feet at the south end, being one hundred and thirty-two feet in length from north to south. The appellant owned the parcel of ground so proposed to be made a part of Stewart avenue. On the 17th day of January, 1900, the city of Chicago filed a petition in the county court of Cook county to condemn the parcel of land for the purpose of converting it into a portion of Stewart avenue. Upon a hearing judgment of condemnation was entered in accordance with the prayer of the petition, on the payment to the appellant of the sum of $2250 as and for his just compensation for land so taken and damaged. This appeal has been perfected to reverse the judgment of condemnation.

It is not contended the amount adjudged to be paid the appellant as just compensation for the lands taken, and for his damages, is inadequate. The defense sought to be made in the county court, and which is renewed in this court, is, that the purpose of the proceedings is to condemn the property in question for other than a public purpose. That private property cannot be condemned to

serve a private interest must be conceded to be a sound doctrine of the law. The ordinance declared the property should be condemned for a public use, namely, to compose a part of a public street of the city, and to be improved by the city council and used by the public as and for a street. The power to alter or widen its streets is expressly given to the city by paragraph 7 of section 1 of article 5 of chapter 24, entitled "Cities and Villages." (1 Starr & Cur. Stat. p. 692.) If such is found to be the object of the condemnation proceeding the judgment here appealed from must be affirmed.

The ground of defense to the petition in the trial court, and on which is based the insistence in this court that the judgment should be reversed, is set forth in the following objection to the petition filed by the appellant in the county court:

10. "Said city of Chicago, in the passing of said ordinance and in the filing of said petition, is acting for and on behalf of the Chicago, Rock Island and Pacific Railway Company, a private corporation, and not in the interest or on behalf of the people of the city of Chicago. By ordinance of the said city of Chicago of July 9, A. D. 1894, the said railway company was ordered to elevate its tracks where they cross said Stewart avenue and said Seventy-second street. By an ordinance amendatory of said ordinance of July 9, A. D. 1894, of January 17, 1898, (the material parts of which are made part hereof and attached hereto as 'Exhibit A,') said railway company was illegally and without warrant of law permitted to fill up its right of way over and along said Stewart avenue, both south and north of said Seventy-second street, so as to make exclusive use thereof and destroy said avenue for the purpose of a public street or highway. In and by the terms of said last named ordinance said railway company also undertook and promised to procure and dedicate for purposes of a public street said lands so proposed to be condemned, within six months

after its passage; and the said city of Chicago, illegally and without warrant of law, undertook and promised, in the event and on condition that said company should be unable to purchase said lands at a price deemed by it reasonable, to condemn the same for street purposes, the said company to pay the compensation and damages awarded, including costs and expenses of litigation, and to have the right to be represented by special counsel and to produce witnesses to testify in such proceedings. This proceeding, and the pretended ordinance on which it is based, is in pursuance of said unlawful undertaking, whereby said city of Chicago is acting, not in behalf of the public or for any public purpose, but on behalf of said railway company, to obtain said lands, for it to replace, in a most inadequate way, a part of said avenue which it has illegally been permitted to appropriate to its own use, as aforesaid; and this, notwithstanding the fact that said company made no attempt to procure said lands, as in and by said last named ordinance it was required and undertook to do."

The Chicago, Rock Island and Pacific railroad enters the city of Chicago from the south, and runs some ten or twelve miles through the city and across many of its streets, to its depot, at VanBuren street. The railroad crosses the intersection of Stewart avenue and Seventy-second street. The crossing was formerly at grade. An ordinance was adopted by the city of Chicago on the 10th day of July, 1894, which was intended to secure the elevation of the tracks of the railroad at street crossings in the city. An amendatory ordinance was adopted four years later, January 17, 1898, which required the company to elevate the tracks of its railroad at Stewart avenue and Seventy-second street and at other street intersections. Stewart avenue runs north and south. Seventy-second street runs east and west and crosses the avenue at right angles. The Chicago, Rock Island and Pacific Railroad Company has three tracks, which

cross the intersection of the avenue and Seventy-second street in a south-westerly and north-easterly direction. The following will serve to indicate the location of the streets and of the tracks of the railroad:

It should be observed but one railroad track appears on the diagram,—that marked by the heavy, dark lines. It is the center of the three tracks which were there when the ordinance was adopted. Appellant's premises are located at the south-east corner of Stewart avenue and Seventy-second street. They comprise a tract or block of ground one hundred and thirty-two feet north and south and one hundred and sixty-five feet east and west, which does not seem to be included in the plat of the adjoining lots and which extended further westward than the lots adjoining it on the south. The line which on the plat touches the north-west corner of appellant's premises at the south-east corner of the street intersection, and the south-west corner of lot 7 in block 5 at the north-east corner of the intersection, and passes thence into lot 7, is intended to denote the easterly boundary of the right of way of the railroad company. The two dark lines indicate the center track of the three tracks of the railroad, and the line beyond them to the west represents the westwardly boundary line of the right of way of the railroad company. At the north end of lot 7 all of the right of way is on the east side of the avenue, and at this point, which is on the block between Seventy-first and Seventy-second streets, the railroad company maintains a depot, called Eggleston. The right of way is all to the west of the avenue half a block, or thereabouts, south of Seventy-second street.

While the amendatory ordinance was pending before the city council several methods of elevating the tracks of the railroad company at this street crossing were proposed and considered. One method contemplated the erection of a bridge or viaduct in Stewart avenue to be supported by pillars placed in the avenue. This plan made necessary the construction of a bridge or viaduct in Stewart avenue from a point about one hundred feet south of the street crossing to a point about one hundred and sixty feet north thereof, and required that twenty-

two pillars should be set in place in Stewart avenue, whereby space under the bridge would be provided for two longitudinal driveways in the avenue, each thirty feet in width, and for two sidewalks, each ten feet in width. This plan, however, required the location of two pillars in or near the center of Seventy-second street at the east side of the street intersection, and two other pillars near the center of the intersection of the street and the avenue. If so placed these pillars would greatly obstruct passage of vehicles along Seventy-second street and also from Stewart avenue into and along Seventy-second street, and would render the use of the street and the avenue unsafe for public use. The evidence also tended to show the other pillars so proposed to be located in the avenue would obstruct travel along and upon the avenue, and render the use of the avenue, in a degree, unsafe. It was shown to be possible to span the intersection with a single bridge, but it seems that would render it necessary either to raise the grade of the railroad or lower the grade of the street. The system of sewerage in place forbade the adoption of the plan of lowering the grade of the street, to say nothing of the injury to abutting property which would result from the depression of the street to the necessary lower level. The grade of the railroad, if raised to the requisite height for a single-span bridge at this intersection, must necessarily be raised also for the distance of some blocks to the north and to the south, at the depot, and at other street intersections where it was not desirable, and perhaps not feasible, to do so. Another plan was that which was adopted. It contemplated a sub-way across the avenue for the full width of the roadway of Seventy-second street,—that is, sixty-six feet in width,—and that such sub-way should be free from and wholly unobstructed by either posts or pillars. This open sub-way, it was considered, would secure to the public the safer and more convenient use of the street, and the plan of elevating

the track which proposed the sub-way was deemed the more desirable and satisfactory of any offered to the council by those learned in the science of engineering. The three tracks of the railroad so occupied the avenue at the street crossing, and to the north and south thereof, that the walls of the sub-way, if constructed east and west under the tracks across the avenue, would, because of the manner in which the tracks cross the avenue, extend to the lot lines at the south-east and north-east corners of the street intersection, as will be seen by reference to the plat. The sub-way walls, the lateral and retaining walls of the structure on which the tracks would rest, would so occupy the avenue that there would not remain sufficient street surface to provide easy and convenient access to the entrances to the sub-way. This result could be avoided by so constructing the sub-way that it would extend under the tracks in a north-westerly and south-easterly direction, as shown on the plat, and by procuring the strip marked "A" from the lot at the north-west corner of the street intersection, and the strip from appellant's lot at the south-east corner of the street intersection, as shown by the shaded lines on the plat, and converting each of such strips into parts of Stewart avenue, thus providing access to the eastwardly and westwardly entrances of the sub-way. The narrowing of the right of way of the railroad company adjoining each of said strips of land, and the improvement of the same as a street, were also necessary to the elevation of the tracks under the plan. As we understand the testimony, the railroad company owned its right of way, and that the street and the avenue had been laid out thereon.

The city council, in view of all that has been said, determined that if the railroad company would donate the necessary strips from its right of way, and would procure, or relieve the city from the expense of procuring, the strips of ground needed to be taken from appellant's lot and from the lot at the north-west corner of

the street crossing to effect the necessary widening of the avenue, the council would adopt the plan of elevating the tracks by way of the sub-way, as before mentioned. The railroad company consented to elevate its track on the plan so proposed, and the amendatory ordinance was thereupon adopted by the city council. This ordinance provided, among other things, that the floor of the sub-way should not be less than 12.5 feet above city datum; that a depression of more than 4.9 feet in the street should not be made; that the sub-way should be sixty-six feet wide, and that the width of the approaches thereto in Stewart avenue, at the north-westerly entrance and south-westerly entrance, respectively, should be twenty-eight and forty feet in width, and that the railroad company should bear all the expense of elevating its tracks, including the cost of procuring the grounds necessary to be used in widening Stewart avenue, as before described. Section 3*g* of the amendatory ordinance is as follows:

"Sec. 3*g*. In consideration of the rights and privileges hereby granted to the Chicago, Rock Island and Pacific Railway Company are upon the conditions that said railway company shall, within six months after the passage of this ordinance, procure and dedicate for the purpose of a public street the following described property, namely: [Here follows description, which includes that part of appellant's premises proposed to be condemned.] In case said Chicago, Rock Island and Pacific Railway Company shall be unable to purchase said property, or any part thereof, described in this section, at a price deemed by said railway company to be reasonable, then the same shall be condemned by the city of Chicago for street purposes, and the compensation and damages awarded in such proceedings, including court costs and all other expenses of litigation that may be incurred in such condemnation proceedings, shall be paid by said Chicago, Rock Island and Pacific Railway Company; and said Chicago,

Rock Island and Pacific Railway Company shall have the right to take part in said condemnation proceeding in behalf of the city by counsel specially employed by it, and shall have the right to have all witnesses that it may name, called to testify in said condemnation proceedings."

The petition for the condemnation of appellant's property was filed in pursuance of this amendatory ordinance.

It cannot be contended the purpose of the condemnation proceedings is to seize the land of the appellant, in the name of the city, in order the railroad company may apply the land so seized to its use. The land to be taken from the appellant is to be devoted to the use of the public,—is to be used by the public as a public street. The necessity for its use arose out of the plan adopted by the city for the elevation of the tracks of the railroad company over the public street crossing. The argument in behalf of the appellant is, that the plan so adopted permitted the said railroad company to so construct the sub-way, and lateral and retaining walls thereof, that the public would be excluded from the use of the avenue in the larger part, and that the purport, intent and effect of the amendatory ordinance are to authorize the railroad company, in the name of the city, to employ the powers of condemnation enjoyed by the city to enable the railroad company to seize the property of the appellant and deliver it over to the city for use as a street, in lieu of those parts of the avenue of which the city has given the exclusive use to the railroad company. The wrong, as counsel insist, is, not that the appellant's property is sought to be taken for the use of the railroad company, but that the necessity for taking it for the use of the public arose out of the unlawful and unauthorized act of the city in devoting Stewart avenue to the uses of the railroad company.

That it is a legitimate use of a street to allow the tracks of a railroad to be laid upon it was declared to be the settled law of this State as early as in the case

of *Murphy* v. *City of Chicago*, 29 Ill. 279, and the declaration has been frequently re-affirmed by this court. The evidence in the case at bar is consistent only with the view the railroad company owned its right of way, and that the avenue and the street had been laid out across and upon the right of way. It is not contended it is not within the power of the city to cause the tracks of the railroad company to be elevated. The great advantage to the public to be attained by the elevation of the tracks of railroads at street intersections of a city is too manifest to be questioned. Not only public convenience and the business of the community are advanced by the elevation of the tracks, but that which is by far the more important, the citizen is secured from the many dangers which imperil life and limb where the trains of railroad cars cross street intersections at grade. The use of a street by a railroad, though lawful and legitimate, to some extent obstructs the street and to a degree deprives the citizen of the full and unrestricted use of it. That is inevitable. The elevation of the tracks of a railroad cannot be accomplished at any street intersection, by any means or appliance now known to engineering skill, without placing something in the street that to some extent obstructs the use of the street by the general public. At the crossing of Seventy-second street and Stewart avenue the location of the tracks of the railroad and of the street and the avenue was such that the elevation of the tracks could not, as the evidence discloses, be accomplished without obstructing the avenue and the street intersection to a much greater extent than would be found necessary at street crossings where ordinary conditions were found to exist. The plan of effecting the elevation of the tracks by means of a bridge or viaduct involved placing pillars in the avenue and street in such numbers and so located as to obstruct the free passage of teams and vehicles, and to render the use of the street, to some extent, dangerous to the public. The

elevation could, no doubt, have been effected in that way, and in that event it would have been unnecessary to widen the street by extending it over a portion of the appellant's lot.  But the other plan,—that which was adopted,—required the railroad company to carry its tracks over the street crossing by supporting the tracks on brick or stone walls and provided the sub-way for the use of the public.  Though the walls of the sub-way and the retaining and lateral walls, made necessary by that plan of elevation, occupied more of the surface of the street than would have been occupied by the pillars and foundations of the pillars had the plan been adopted of elevating the tracks by means of a bridge or viaduct, and therefore excluded the public from the street to a greater extent, still the question of the exclusion of the public was one merely of degree.  The elevation of the tracks could not be secured without placing in the street some impediment to travel.  It was indispensable that the surface of the street should be occupied by that which should serve as the foundation for the structure upon which the elevated tracks should rest.  If it should be conceded the plan of supporting the tracks by pillars placed in the streets would have left a greater part of the space in the streets open for the use of the public, we are not prepared to hold it was not within the power of the city council to adopt the other plan of supporting the tracks on walls of masonry, though the latter plan involved the necessity of using so much of the streets for the foundation of the walls it would become necessary to provide for the condemnation of private property and the conversion of such property into a street, in order the public should be furnished with access to and from the sub-way.  The merits of the different methods for elevating the tracks could not be determined alone by consideration of the question of the amount of space which would be required by the pillars or the walls.  The facilities of passage and of transit, the safety and conve-

nience of the public, should be controlling factors in the determination of the manner of effecting the elevation of the tracks. When these considerations demand the adoption of a plan of elevation which makes necessary the appropriation of portions of the street to the structure necessary to support the elevated tracks, such appropriation of the streets cannot be deemed an unlawful diversion of the street to the use of the railroad company. The public interest and the necessities of the public being conserved thereby, there would be no diversion of public property to private use. We held in the case of *Doane* v. *Lake Street Elevated Railroad Co.* 165 Ill. 510, "that a street railway operated by electricity, with trolley-posts on the streets, was not a new servitude of the street, and that the poles were not unwarranted obstructions in the same, as our telegraph and telephone poles, 'because such erections aid and facilitate the use of the public street for the purposes of travel and transportation.' The same is true of the pillars used in constructing elevated roads. In view of the known fact that such elevated lines in large cities greatly accommodate the public by increasing the facility and safety of transit, it can scarcely be seriously contended that permitting them to be constructed and operated is to subject the street to a new servitude or unlawful use."

Nor can pillars or walls directed by the city council to be placed in the streets for the purpose of supporting elevated steam railway tracks at public street crossings be declared to be the subjecting of the streets to an unlawful use. If the city council, in the exercise of its legislative function, acting, as we are to presume it does, in good faith for the best interest of the public in the matter of the elevation of the tracks of a railroad at a street crossing, shall determine the interest and safety of the public will be best conserved by providing a passageway under the tracks through a sub-way, and of supporting the tracks by means of walls of masonry on

either side of the sub-way and by lateral and retaining walls in the street, there is no reason, it seems to us, the courts should assume to declare the action of the council to be unauthorized by law simply because the plan so adopted made it necessary the council should widen the streets in order the public might be provided with the requisite street facilities. The provisions of the amendatory ordinance authorizing the erection of the sub-way walls and the lateral and retaining walls in Stewart avenue cannot, under the circumstances, be denounced as an unlawful perversion of Stewart avenue to the private use of the railroad company. The end to be attained was to accommodate the public business and increase the facilities and safety of 'transit along the street and the avenue and across the intersection thereof. The adoption of the plan for the elevation of the tracks of the railroad, and at the same time securing and preserving the rights of the public, must be recognized as being committed to the judgment and discretion of the city council and within the power granted to the city by the law-making body of the State. The abuse of such discretion and power would, of course, be the subject of judicial investigation. That the ordinance required that the railroad company should defray all expenses occasioned by the widening of the avenue could not affect the character of the use to be made of the property to be condemned and converted into a street or avenue.

There is no room for contention as to the purpose to which it is intended to devote the strip of land to be taken from the lot of the appellant. It is for the use of the public as a street. In *Ligare* v. *City of Chicago*, 139 Ill. 46, we said (p. 64): "We do not deny that the city has power to widen streets, generally, and that when it has undertaken to do so the motives that may have actuated those in authority are not the subject of judicial investigation; but the purpose for which a thing is done is very different from the motives which may have actuated

those by whom it is done, and is in the present instance a legitimate subject of judicial investigation, for the right to exercise the power of eminent domain is in all cases limited by the *purpose* for which it shall be exercised, as thus private property may be condemned for public use; but it may be shown that the use, in fact, is not public, but private." The purpose of the proceeding at bar is to condemn the property in question for a public use, and even if the motives which actuated the city council in adopting the amendatory ordinance were the proper subject of judicial investigation, there is nothing in the record to indicate the council was moved by any other motive than that of providing for the safety of the citizens, the accommodation of public travel, the preservation of the necessary facilities for transit and the dispatch of the business of the public, or that the council abused the power over its streets with which it is invested by the grant from the legislature.

We do not regard anything here decided as inconsistent with the principles which controlled in the decision of the cases of *Ligare* v. *City of Chicago*, 139 Ill. 46, and *Ligare* v. *Chicago, Madison and Northern Railroad Co.* 166 id. 249, or either of them. The first of these cases was a petition by the city of Chicago to condemn one hundred feet for the ostensible purpose of widening Archer avenue. We there said (p. 61): "Archer avenue is sixty feet wide. One steam railroad track is now laid on it and operated by the Chicago and Alton Railroad Company. The ordinance adds, at the point under consideration, one hundred feet to the street, and takes thirty feet of that and adds it to the sixty feet, making ninety feet, and upon this authorizes the Chicago and Alton Railroad Company to lay and operate two additional tracks and the Chicago, Madison and Northern Railroad Company to lay and operate four tracks,—making in all seven tracks to be laid and operated by steam engines within this ninety feet, or one track for every twelve and six-

sevenths feet, and then requires that the part thus to be used shall be cut off from the remaining seventy feet of the street to be added, by a stone or brick wall twelve feet in height." We there recognized that it is a legitimate use of a street to allow a steam railroad track to be laid upon it and that the city possessed authority to authorize a railroad track·to be laid in a street, but ruled that the primary object of a street is for the purpose of travel, and that a city could not be allowed to abuse such power by permitting so many railroad tracks to be laid in a street that all others would be deprived of the rightful use thereof, and then seek to condemn land to broaden the street for the purpose of allowing other railroad tracks to be laid on part of the land so condemned and of using the remainder for uses of the public as a street. We there said (p. 65): "Here it is shown that the condemnation is for the express purpose of enabling the city to give an exclusive use of a part of the old street, and thirty feet of additional space, to the exclusive use and occupation of railroad companies. The substance is not to be lost sight of through any mere jugglery in the use of words. This proceeding is, in fact, not for the city, but for the railroad companies. Between condemning for the railroad companies and condemning for the city to then give to the railroad companies, there is, in legal effect, and so far as concerns this case, no difference." In the case at bar the city council has not abused the power possessed by it by allowing the tracks of railroad companies to be laid in the street. On the contrary, it seems the streets were laid out, or partly so, on the right of way of the railroad company. The object of the action of the city council in passing the amendatory ordinance was not to grant the railroad company additional privileges in the streets, but to secure the elevation of the railroad tracks, which were already in the streets, in the interest of the safety of the public in the use of the highway and to increase the facility of passage for

vehicles and footmen across and along the streets. In the case at bar the city council was engaged in the discharge of a duty it owed to the public, and the condemnation proceeding was instituted for the purpose of enabling it to discharge that duty and preserve the rights and interests of the public. In the *Ligare case* the condemnation proceeding was not for the benefit of the public, but for the benefit of the railroad companies.

After the decision of the former of the *Ligare cases,* in which the ordinances of the city were held void, the city adopted another ordinance providing that Archer avenue should be widened seventy feet, and filed a petition to condemn the necessary ground to so widen the avenue. The Chicago, Madison and Northern Railroad Company filed a petition to condemn a strip of ground thirty feet in width for its use. The two strips so sought to be condemned composed the strip of one hundred feet ordered to be condemned in the ordinances of the city which were held void in the first of the *Ligare cases.* The petition of the city and of the railroad company for the condemnation of the strips of ground, respectively, were considered and heard together. Judgments of condemnation were awarded as prayed in the petitions. The latter of the *Ligare cases* asked reversal of these judgments. We affirmed the judgment of condemnation, and in the course of the opinion rendered in the case said (p. 256): "Independently of the right of the municipality to determine for itself the propriety or impropriety of altering and widening its streets and of otherwise improving the same under its charter, we think the inference is clear, from the showing made, that if all the tracks for steam railways were removed from Archer avenue except the one which appears to have been lawfully there when the first proceedings were begun, the state of travel had become such, especially in view of the difficulties in crossing Ogden slip, that it was no abuse of its power for the city to provide for the widening of this street at the locality in

question. * * * As the case is now presented we have nothing to do with the question whether the additional tracks laid in Archer avenue are rightfully there or not, for, whether rightfully or wrongfully there, the city has power to alter or widen the street, and as this record does not show any abuse of such power the courts can not interfere with its legislative discretion." We rest the judgment of affirmance in this case upon the same principle there announced.

The city council, in requiring that the tracks of the railroad should be elevated at the crossing of Stewart avenue and Seventy-second street, and in the determination of the mode and manner of accomplishing such elevation, were engaged in the discharge of a duty lawfully devolving upon them. The proper discharge of that duty involved the exercise of the judgment and discretion of the members of the council. "The general rule is, that where legislative or discretionary powers are conferred upon municipal corporations, the courts will not interfere unless, in the exercise of such discretion, there is fraud, manifest oppression or gross abuse." (20 Am. & Eng. Ency. of Law,—2d ed.—1229, and cases decided in this court cited in note 8.) The burden which fell upon appellant to yield his property to the public is one which, in the judgment of the city council, was required for the public good. He was entitled to be compensated for his property taken or damaged for the public use, and that was awarded to him by the judgment here appealed from.

The judgment of condemnation was properly entered, and it will be affirmed.          *Judgment affirmed.*

Mr. CHIEF JUSTICE MAGRUDER, dissenting.