THE PEOPLE *ex rel.* D. G. Murphy *et al.*

*v.*

THE ATCHISON, TOPEKA AND SANTA FE RY. CO. *et al.*

*Opinion filed October 24, 1905.*

1. MUNICIPAL CORPORATIONS—*city cannot vacate street to subserve private interests.* A municipal corporation holds its streets and alleys in trust for the benefit of the public, and cannot lawfully vacate or permanently obstruct them for the benefit of a private individual or a corporation.

2. SAME—*right of a city to pass track elevation ordinance.* A city has a right, in the interest of public safety, to compel railroad companies to elevate their tracks within city limits even though certain streets must be changed or even vacated or closed, provided the streets are vacated in the manner required by law.

3. SAME—*three-fourths vote essential to vacate street.* Streets of a city cannot be vacated or permanently obstructed, even as part of a general track elevation scheme, unless such vacation is authorized by a three-fourths majority vote of the city council, as required by the act of 1874 (Rev. Stat. 1874, p. 1092,) concerning the vaction of streets, alleys and highways. (*Summerfield* v. *Chicago,* 197 Ill. 270, and *Village of Winnetka* v. *C. & M. Elec. Ry. Co.* 204 id. 297, distinguished.)

APPEAL from the Circuit Court of Will county; the Hon. DORRANCE DIBELL, Judge, presiding.

The city of Joliet is organized under the City and Village act in force July 1, 1872, and the several amendments thereto.   Its streets and avenues are laid off substantially east and west and north and south.   The Chicago, Rock Island and Pacific railroad crosses in a north-easterly and south-westerly direction most of the streets it intersects.   The Chicago and Alton and Atchison, Topeka and Santa Fe railroads pass through the city in a general northerly and southerly direction.   The Elgin, Joliet and Eastern and the Chicago, Lake Shore and Eastern railroads adjoin the Chicago and Alton on the east and extend from the north city limits south to VanBuren street.   The Michigan Central railroad is about parallel with and one and one-half blocks south-east of the Chicago, Rock Island and Pacific, extending from the eastern city limits, in a westerly direction, to Michigan street.   The several streets and avenues crossed by the said railroads which run in a northerly and southerly direction, beginning on the north, are Columbia, Liberty, Irving, Ohio, Clay, Jackson, Benton, Webster, Cass, Clinton, VanBuren, Jefferson, Washington, Marion and Osgood streets, Third avenue, (which has never been open for public travel across the railroads,) and Fourth and Fifth avenues.   Those crossed by the Rock Island in its north-easterly and south-westerly course through the city, and beginning at the north-east, are Collins and Herkimer streets, Eastern avenue, VanBuren, Scott, Jefferson, Chicago, Washington, Ot-

tawa, Joliet and DesPlaines streets, and some other streets west of the DesPlaines river but outside of the district affected by the ordinance in question herein. In February, 1903, the city council of the city of Joliet passed an ordinance (No. 2071) requiring all of said railroad companies to elevate their tracks by embankments and to construct and maintain suitable and ample sub-ways at each of said streets for the safe passage under their tracks of the public travel. The companies failed to comply with that ordinance, and suits were brought by the city authorities against them, which were pending and undetermined when, on November 4, 1904, another ordinance, said to be and which was in fact a compromise between the city council and the railroad companies, was introduced in the city council and subsequently declared passed by the mayor. It is designated Ordinance No. 2160, and in this ordinance the area of track elevation is smaller than in the first ordinance, and instead of beginning north of Ohio street on the north, it begins at Jackson street, which, however, is preserved as a grade crossing, the grade of the same being raised about four feet. Proceeding south on the Alton and Sante Fe and other tracks running north and south, sub-ways are provided as follows: at Cass, Clinton, Jefferson, Washington and Osgood streets and at Fourth and Fifth avenues, thus authorizing the obstruction of Benton, Webster, VanBuren and Marion streets and Third avenue by embankments of earth, cinders, etc., upon which the elevated tracks were to be raised. This Ordinance No. 2160 authorized the Rock Island and Michigan Central to have a joint right of way north-east and south-west through the city, using substantially the present Michigan Central right of way from the east city limits west to Michigan street, an entirely new right of way from this point to the present Rock Island tracks, just west of Ottawa street, and then along the Rock Island right of way (as at present) through the city to the south-west, and on this new right of way required sub-ways at Herkimer street, Eastern avenue,

Michigan, Washington, Chicago and Ottawa streets, and continued the use of the sub-way already existing at Des-Plaines street, and therefore authorized the obstruction of Collins and Joliet streets.

The Attorney General, in the name of the People of the State, on the relation of David G. Murphy and a number of other resident citizens and tax-payers of the city, filed a bill in the circuit court of Will county against said railroad companies to restrain the construction and erection of permanent embankments across said several streets, alleging, among other things, that said last named ordinance was not voted upon or passed by the city council, and was therefore void; that the city council had no legal right or authority to license or authorize the defendant railroad companies to permanently obstruct or encroach upon the said streets; that the embankments authorized across said streets would constitute a purpresture and public nuisance and would permanently close and obstruct the same for their respective full widths, and that the same would be thereby rendered impassable for public travel; that the effect of carrying out the provisions of said ordinance would be to vacate or close certain portions of said streets and avenues, and that under the statute a street or avenue can only be vacated or closed by a three-fourths vote of all the aldermen elected to the city council, and that if said ordinance No. 2160 was voted upon at all by the city council, a less number than three-fourths of the aldermen voted for the same. It is then alleged that the railroad companies are threatening to proceed to permanently close up and obstruct said streets and avenues by building upon their respective rights of way across the said streets and avenues permanent embankments of earth, cinders, etc., to the average height of twelve feet or more, and that they will do so unless restrained.

The city of Joliet and county of Will were each afterwards made parties defendant on their own intervening petitions, and they, with the several railroad companies, filed

answers, but prior thereto the complainant entered his motion for a temporary writ of injunction, which was heard on the bill and arguments of counsel and denied. The answers are voluminous, but we do not understand them to dispute the material facts alleged in the bill, which we regard as important in the decision of the case. The cause was afterwards heard upon proofs presented. From the order and decree of the circuit court denying the writ of injunction and dismissing the complainant's bill for want of equity this appeal is prosecuted.

W. H. STEAD, Attorney General, and W. H. BOYS, (J. W. DOWNEY, and FRED MORIARTY, of counsel,) for appellants.

ROBERT E. HALEY, and JAMES A. McKEOWN, for appellee the city of Joliet; BENJAMIN S. CABLE, and SNAPP, HEISE & DIBELL, for the Chicago, Rock Island and Pacific Railway Co.; WINSTON, PAYNE & STRAWN, J. L. O'DONNELL, and P. C. HALEY, for the Chicago and Alton Railroad Co. and the Michigan Central Railroad Co.; KNAPP, HAYNIE & CAMPBELL, and J. L. O'DONNELL, for the Elgin, Joliet and Eastern Railway Co. and the Chicago, Lake Shore and Eastern Railway Co.

Mr. JUSTICE WILKIN delivered the opinion of the court:

On November 4, 1904, the railroad committee of the city council, to which had been referred ordinance No. 2160, made its report, recommending "that the ordinance known as the track elevation ordinance be adopted," and the chairman of the committee moved the adoption of the report. The vote was taken upon that motion, and, the city council consisting of fourteen members, eight votes were cast for and five against it, (one alderman being absent,) whereupon the mayor declared the motion carried and the ordinance adopted. About one-half of the population of the city is located east of the Chicago and Alton and Santa Fe tracks,

and must pass over some of the above named streets in order to reach by direct travel the business part of the city, which is west of the tracks. The population is also about evenly divided by the Rock Island tracks, extending in a south-westerly direction. Beginning on the north, Benton, Webster, VanBuren and Marion streets and Third avenue will be each permanently and completely closed by the embankments on the Chicago and Alton and Atchison, Topeka and Santa Fe, and Collins and Joliet streets will be closed by the embankment on the Rock Island and Michigan Central, if constructed, absolutely preventing all travel on said streets for at least the distance of the width of the embankments, and practically on the ends of the said streets between the embankments and the next cross-streets. That is to say, those wishing to travel on either of those streets across the Chicago and Alton and Atchison, Topeka and Santa Fe tracks from the east to the business part of the city, must, upon reaching Eastern avenue, (the first north and south street east of the crossing,) turn either north or south on that avenue and proceed to one of the streets provided with a sub-way, and thence over that street through the sub-way to the next cross-street on the west, (which is Scott,) thence south or north back to the obstructed street, and on west to their destination. Otherwise expressed, we understand it to be admitted on behalf of the city and railroad companies that if the ordinance in question is carried out according to its terms and provisions by the erection of the proposed embankments without sub-ways at all of the said streets, it will permanently and completely prevent all public travel upon those streets; but their contention is, that because these obstructions can be avoided by diverting the travel over cross-streets to those having sub-ways there will not be a legal closing or obstructing of the streets at which no sub-ways are required to be constructed.

It is settled by the frequent decisions of this court that a municipality holds its streets and alleys in trust for the

benefit of the public, and cannot lawfully authorize the vacation or obstruction of any of them for the use and benefit of private individuals or corporations. The authorities on this proposition will be found cited in the late case of *People* v. *Harris,* 203 Ill. 272. The city council is given power, by statute, "to lay out, to establish, open, alter, widen, extend, grade, pave or otherwise improve streets, alleys, avenues, sidewalks, wharves, parks and public grounds, and vacate the same." (Hurd's Stat. 1903, chap. 24, sec. 62, clause 7, p. 291.) Under the power to alter and widen streets, we have held they may reduce their width for the benefit of the public by vacating parts thereof. (*City of Mt. Carmel* v. *Shaw,* 155 Ill. 37.) Under the general supervisory power over their streets and alleys the city authorities may allow temporary obstructions of the same, so as to permit improvements thereon to be made or building materials to be temporarily stored for the erection of private buildings; and in the case of *World's Columbian Exposition Co.* v. *Brennan,* 51 Ill. App. 128, it was held the city authorities might lawfully authorize the temporary closing of a street for the purpose of enabling the exposition company to perfect its improvements and in the interest of the public safety. In all cases, however, where the closing of public streets and alleys has been justified, the obstruction has been temporary and more or less for the public benefit or safety. Therefore none of the decisions above referred to directly affect the questions here involved, the contention on the part of the defendants being, that this is not an attempt to close the streets for the benefit of the railroad companies, but to compel them to elevate their tracks in the public interest, and incidentally authorizing them to obstruct the streets. The theory of the complainant's bill is, that the permanent closing of the streets is, in part at least, for the benefit of those private corporations, and is not the mere exercise of the power of the city council to compel the elevation of railroad tracks; also, that the ordinance is, in effect, one to vacate public streets, and

therefore not passed by the requisite statutory majority; and finally, that the city council has no power to completely and permanently close up its public streets and alleys by an ordinance passed by its city council by less than a three-fourths majority of all the aldermen elected in the city.

The dispensing with grade crossings at public streets is an improvement certainly to be most earnestly desired, and the elevation of railroad tracks cannot be regarded as other than a wise precaution against the destruction of life and property. It may also be conceded that in carrying out a general plan to require railroad tracks to be elevated in a city like Joliet some change in, or even the vacation or closing up of, some of the streets and alleys may become necessary in order to effectually carry out the scheme. We do not question the power of municipalities to order railroad companies within their corporate limits to elevate their tracks across all public streets and alleys, nor that they may not, in order to carry out that policy, authorize the vacation, closing or permanent obstruction of certain of its streets and alleys. The question here is, how must it be done? Has a bare majority of the city council power to do so by an ordinance passed by less than a three-fourths majority vote of the city council? It is provided by section 1 of chapter 145 (Hurd's Stat. 1903, p. 1897,) "that no city council of any city * * * shall have power to vacate or close any street or alley, or any portion of the same, except upon a three-fourths majority of all the aldermen of the city * * * authorized by law to be elected; such vote to be taken by ayes and noes and entered on the record," etc.

It is insisted by the Attorney General that while ordinance No. 2160 does not, in terms, propose to vacate or close streets, such is its plain import and direct effect, and we have been unable to discover satisfactory answer to that contention. The law will look to the substance and not to the mere form used in every such case. The city council can not be permitted to do indirectly that which it has no power

to do directly. The substance is not to be lost sight of in the mere use of words. (*Ligare* v. *City of Chicago,* 139 Ill. 46.) The proposition is so reasonable that, unaided by authority, no court could hesitate to adopt it. That the effect of the ordinance in question is to practically vacate and close up the streets for which no sub-ways are provided admits of no doubt, nor is the fact disputed. In this connection we do not regard the question whether the title of the act quoted is broad enough to include the word "close," as at all material. Practically, to permanently close up a street is to vacate it.

But suppose it be conceded that the ordinance is not to be construed as one to vacate parts of streets, the question still remains, has a city council power, even in the interest of the public safety, to authorize the permanent obstruction and vacation of its public streets and alleys without the requisite three-fourths majority of the city council? We repeat, the power of the city council to do what is here attempted is not doubted, provided it is done by an ordinance legally passed by a three-fourths majority vote, but we hold that it can do so only by an ordinance legally passed, vacating the streets or parts of streets and alleys sought to be permanently closed up and vacated. While this bill, being by the Attorney General, need not show an injury to private rights, still it is material to consider whether private citizens, situated as those here complaining, have not such an interest in each of the public streets of the city as will authorize them to insist, through the State's attorney or Attorney General, that the city council shall exercise the trust over the public streets and alleys reposed in it, for the benefit of all the people, and prevent, much less authorize, their permanent obstruction or vacation unless the statutory majority shall concur therein. Each alderman sustains a trust relation to the public over the streets and alleys of the city. Less than a three-fourths majority of them cannot perform that trust by allowing the streets to be vacated or per-

manently obstructed. The law has provided a method for the accomplishment of that which is here attempted,—that is, by the adoption of an ordinance vacating the parts of the streets obstructed. It cannot lawfully be done by a different and unauthorized method. The passage of ordinance No. 2160 by a bare majority vote of the aldermen of the city was an unauthorized attempt to invade the rights of the citizens of the municipality. It cannot be said in answer to this position that the city may at some time in the future cause the obstructions to be removed or sub-ways constructed in all the streets. The right to do this is reserved by the ordinance for the reason it is claimed that to do so is impracticable or impossible in view of the location of side-tracks on the present surface and the situation of various manufacturing establishments near the tracks.

Some reliance seems to be placed by counsel for the defendants below upon the case of *Summerfield* v. *City of Chicago,* 197 Ill. 270, and the later case of *Village of Winnetka* v. *Chicago and Milwaukee Electric Railway Co.* 204 Ill. 297. We do not understand these cases to in any way support the contention of counsel. In neither of those cases was there a closing or obstruction of the entire street or a claim of right to do so, but in the *Summerfield case* only a small portion of the street was authorized to be used for the erection of walls to support the elevated structure, the railroad company agreeing to provide at its own expense, by condemnation of private property, a sufficient amount of ground to supply the place of the part taken, and the question there was whether a condemnation proceeding for that purpose could be maintained. The street remained open to public travel notwithstanding the use of a part of it for the erection of the walls, and the case was held to be within the rule announced in *Doane* v. *Lake Street Elevated Railroad Co.* 165 Ill. 510. In the *Winnetka case* it was simply held that "the use of part of the street for street railway purposes is legitimate, and the municipal authorities, acting for the pub-

lic, may authorize the construction of a viaduct for the tracks, even though it excludes the public to some extent from the use of that part of a street." To change a street, even though in doing so the public is excluded to some extent from parts of the same, is a very different proposition from that of permanently closing up such a street. If the ordinance in question had provided that the streets for which no sub-ways are authorized should be changed so as to connect with those left open a different question would be presented. Each of the closed streets is left just as it was before,—a street of the city and yet not open to through or continuous travel.

We have read with care and interest the argument of counsel on either side of this case and the opinion of the learned circuit judge denying the writ, and are constrained to hold against the conclusion there announced. If it should prove difficult or impracticable to obtain a three-fourths majority vote of the city council in the adoption of a proper ordinance, that fact, if it exists, cannot affect this decision. It may also be remarked that there is nothing to show that the elevation of the railroad tracks over most, if not all, of the streets could not be made without closing them, as was provided by the former ordinance. But that question cannot be of controlling importance now. If we are correct in the views herein expressed, a court of equity will grant the relief prayed. *Revell* v. *People,* 177 Ill. 468; *Cobb* v. *Comrs. of Lincoln Park,* 202 id. 427.

The decree below will be reversed and the cause remanded to the circuit court, with directions to grant the prayer of plaintiff's bill.    *Decree reversed.*