IDA SEIBERT v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

### Division One, May 24, 1905.

1. **STREETS: Maintenance of Nuisance.** The general rule of law is that a city has no power to place, or to cause or permit any one to place, a nuisance or obstruction upon a public highway which renders the highway dangerous to travelers thereon.

2. ——: ——: **Crossing Gates For Railroad: Protections.** The city permitted the defendant railroad company to erect crossing gates, enclosed at each of the four corners in an iron box, which was two feet and three inches in length and placed one foot inwardly from the curb line of the very broad street which the railroad track crossed. Further in the street the

railroad company placed two pieces of railroad iron, firmly imbedded in the surface of the street and extending upward and toward said box, so as to protect said box from collisions—the whole projection, including the protecting iron, extending five feet two inches from the curb line, and leaving a clear unobstructed space of 39 feet of street between it and a like appliance on the opposite side. Plaintiff's husband, a driver on a fire department wagon, well acquainted with the crossing gates and the iron boxes and their iron protectors, on his way to a fire in the nighttime, drove his wagon along the broad street against the iron protectors, the locality being well lighted at the time. *Held,* that the erection of the crossing gates and their necessary appliances within the limits of the street, did nor constitute such an obstruction as to amount to a nuisance; and neither the railroad in placing them there, nor the city in permitting it to be done, was, under the circumstances, liable for the death of plaintiff's husband.

3. ———: **Cross-Gates: Power of Cities.** The express powers found in the charter of St. Louis are ample to support ordinances requiring the erection of safety gates where railroads cross public streets. But without such express grants, the power to pass such police regulations is an inherent power necessary for the protection of the lives and persons of the citizens using public streets.

4. ———: **Safety Gate: Nuisance.** A safety gate at a point where a railroad crosses a public street is not a private use of the street, but a police protection against injuries by railroad trains to persons passing along the street.

5. ———: ———: **Place of Location.** Whether the machinery by which a safety gate to a railroad crossing a public street is operated, shall be placed within the limits of the street, that is, between the curb lines of the street, or on the sidewalk, which in legal acceptation of the term "street" constitutes a part of the street, is a question resting largely within the discretion of the municipal authorities, and the courts will not interfere therewith unless the presence of such machinery necessarily interferes with the use of the street as a public highway. And where there was a clear, unobstructed space of thirty-nine feet of the street, between the iron protection to the boxes which held the safety gates, it cannot be said that the protectors and boxes necessarily interfered with the use of the street as a public highway by a driver of a wagon thereon.

6. ———: ———: **Application of Statute.** Paragraph 36 of section 5508, page 1280, Revised Statutes 1899, has no application to the authority of the city of St. Louis to maintain safety or crossing gates on a public street which a railroad crosses. That statute is a general statute of the State relating to the charters of cities of the second class.

Appeal from St. Louis City Circuit Court.—*Hon. O'Neill Ryan,* Judge.

REVERSED.

*Martin L. Clardy* and *Henry G. Herbel* for appellant.

(1) As counsel for plaintiff does not allege in his petition any negligence in the construction of the offending crossing gate, or the fenders which were placed beside it for the purpose of protecting it, but simply bases his cause of action on the fact that the gate was an unlawful obstruction in the street, and expressly avers in his petition that both the gate and the fenders were placed in the street by and with the permission of the city of St. Louis, he cannot contend that the fenders were not included in the permit given this defendant to construct this crossing gate, as the law is well settled that a party cannot urge anything inconsistent with his pleadings. Stevenson v. Edwards, 98 Mo. 628; Ramsay v. Henderson, 91 Mo. 565; Pike v. Martindale, 91 Mo. 286; Bank v. Armstrong, 62 Mo. 65; Bruce v. Sims, 34 Mo. 246. (2) The city of St. Louis had the authority to require the defendant to erect this crossing gate in the street. City of Westport v. Mulholland, 159 Mo. 97; State ex rel. v. Murphy, 130 Mo. 25; Smith v. Alabama, 124 U. S. 481; Cartwell v. Bridge Co., 113 U. S. 209. (3) The city had a right to say that the protection which these gates afforded the public against injury by our trains outweighed the danger which the placing of the gate in the street created. The gate had to be placed somewhere, and the city said put it where we did. It could not be hung from the clouds. Thompson v. Macon, 80 S. W. 2; Reed v. Colorado, 187 U. S. 152; Natl. Surety Co. v. State Bank, 56 C. C. A. 660; McGinness v. Railroad, 13 N. W. 821. (4) It is the daily practice of trial courts to instruct the juries in these railroad ordinance cases that the failure to comply therewith is negligence *per*

*se,* and this court has in innumerable decisions sustained the correctness of such declarations. Eswin v. Railroad, 96 Mo. 290; Schlereth v. Railroad, 96 Mo. 509, 115 Mo. 87; Grube v. Railroad, 98 Mo. 330; Kellny v. Railroad, 101 Mo. 67; Murray v. Railroad, 101 Mo. 236; Brain v. Railroad, 86 Mo. 574; Hanlon v. Railroad, 104 Mo. 381; Dickson v. Railroad, 104 Mo. 491; Gratiot v. Railroad, 116 Mo. 450; Hutchison v. Railroad, 161 Mo. 246; Schmitt v. Railroad, 160 Mo. 43; Graney v. Railroad, 140 Mo. 89; Peterson v. Railroad, 156 Mo. 552; Vogg v. Railroad, 138 Mo. 172; Dlauhi v. Railroad, 139 Mo. 291; Bluedorn v. Railroad, 108 Mo. 439; Curley v. Railroad, 98 Mo. 13; Hilz v. Railroad, 101 Mo. 36; Kreis v. Railroad, 131 Mo. 533; Lemay v. Railroad, 105 Mo. 361; McMenamee v. Railroad, 135 Mo. 440; Merz v. Railroad, 88 Mo. 672; Nagel v. Railroad, 75 Mo. 653; Rafferty v. Railroad, 91 Mo. 33; Spillane v. Railroad, 111 Mo. 555, 135 Mo. 414. With this array of decisions against us on the proposition that the failure to comply with the city ordinance was negligence *per se,* we think that the court will agree with us that to hold us liable in this case, because we complied with the ordinance, would be, to say the least, inconsistent, if not unjust. A better practice, it seems, would be to give us the credit of having tried to obey the law, as we had a right to assume, under the decisions of this court, that this ordinance, which plaintiff himself introduced as evidence, requiring us to erect this gate at this place, was valid until it was declared unconstitutional.

*William H. Clopton* and *J. H. Trembley* for respondent.

(1) The city had no power, without express sanction of the Legislature, to authorize such an obstruction of its public streets as that complained of. Telephone Co. v. Billingsley, 77 S. W. 255; Shipper's Comp. & Warehouse Co. v. Davidson, 80 S. W. 1032; Sweet v.

Poughkeepsie, 89 N. Y. Supp. 618. (2) In an action for an injury on a public street the plaintiff is presumed to be in the exercise of reasonable care, and the burden is on the defendant to show the contrary. Louisville v. Keher, 79 S. W. 273; Vocke v. Chicago, 70 N. E. 325; Staring v. Tel. Co., 11 N. Y. Supp. 817. (3) The public is entitled to the whole of the street. Endicott v. Gas & Oil Co., 25 Ky. Law Rep. 862. (4) There was no evidence of contributory negligence in this case. In City of Lancaster v. Walter, 80 S. W. 189, the court held "that although the injured parties knew of the existence of the obstructions in the highways by which they were injured, yet momentarily forgot them, they were not necessarily guilty of contributory negligence by reason of such mental aberration." Louisville v. Premer's Admr., 72 S. W. 9; Maysville v. Guilefoyle, 62 S. W. 495; Madisonville v. Pemberton's Admr., 75 S. W. 229; Vergin v. Saginaw, 125 Mich. 499; Dundas v. Lansing, 75 Mich. 499; Lowell v. Watertown, 58 Mich. 568; Whoram v. Argentine, 112 Mich. 20; McQuillan v. Seattle, 10 Wash. 464; Railroad v. Stout, 17 Wall. 657; Railroad v. Ives, 144 U. S. 408; Railroad v. Van Steinburg, 17 Mich. 121; Maloy v. St. Paul, 54 Minn. 398; Ladouceur v. Railroad, 4 Wash. 38; Denver v. Soloman, 2 Col. App. 534.

MARSHALL, J.—This is an action to recover $5,000 damages for the death of the plaintiff's husband on May 11, 1900, caused by a fire engine, of which he was the driver, colliding with a guard or fender connected with a crossing gate at the northwest corner of Broadway and Poplar streets in the city of St. Louis. The plaintiff recovered judgment for $5,000, and after proper steps the defendant appealed.

The suit was originally instituted against the city of St. Louis and the defendant railway company. The jury returned a verdict in favor of the city of St. Louis, but against the defendant railway company.

THE ISSUES.

The petition alleges that the city of St. Louis is a municipal corporation, and the defendant railway company, a corporation organized under the laws of Missouri; that Broadway is a public street or highway in the city of St. Louis; that plaintiff was the wife of George Seibert, deceased. The petition then alleges that:

"Plaintiff further states that long prior to said 11th day of May, 1900, the said defendant, Missouri Pacific Railway Company, by and with the permission of the said defendant, city of St. Louis, erected and has ever since said time maintained, a large massive cast-iron structure on and in that part of said Broadway intended for driving purposes, and about four feet east of the west curb of said Broadway, just north of said Poplar street, in the city of St. Louis; that said defendant Missouri Pacific Railway Company, by and with the permission of the said defendant city of St. Louis, long prior to said May 11, 1900, placed two large, massive, wrought-iron rails or bars, one on either side of said cast-iron structure hereinbefore described, in such position that one end of each of said iron bars was embedded in the said public street known as Broadway, at least one foot east of the said iron structure, and at least five feet east of the said west curb of said Broadway, and the other end slanting westwardly to the said iron structure at a point distant two or three feet above the paved surface of said street.

"Plaintiff further states that by reason of said position in said street, the said cast-iron structure and wrought-iron rails or rods, were, from the time they were so placed in said street, a dangerous obstruction to the use of said street as a public driveway, and that the defendant city of St. Louis, knew that the said iron structure and wrought-iron rails were dangerous to persons driving on said street; that said

George Seibert, on said 11th day of May, 1900, was employed by said city of St. Louis as a driver on fire engine No. 15, of the fire department of said city; that he was then stationed at the fire station house on Broadway and Valentine streets; that about three o'clock a. m. on the said 11th day of May, 1900, an alarm of fire was given, at said station house, at Eleventh and Chouteau avenue, in said city; that said George Seibert in the discharge of his duty as driver of said engine, drove the same south on said Broadway at the speed required by said fire department under said circumstances; that there was then no danger or other light on or near said obstruction; that while driving said engine, one of the wheels of said engine collided with said obstruction erected and maintained as aforesaid by said Missouri Pacific Railway Company, by and with the permission of the defendant, city of St. Louis; that by reason of said collision said George Seibert was thrown from his seat on said engine into the street and was killed.

"The plaintiff says that the death of said George Seibert was caused by the negligence of the defendant said Missouri Pacific Railway Company in erecting and maintaining said obstruction on said street, and also in so maintaining the same in said street without maintaining a danger light on or near the same at night, and by the negligence of the defendant city of St. Louis, in permitting said defendant Missouri Pacific Railway Company to erect and maintain said obstruction in said street, and in permitting said defendant Missouri Pacific Railway Company to maintain said obstruction in said street by night without maintaining on or near the same a danger light or lights as aforesaid."

The answer of the city of St. Louis was a general denial, with a plea of contributory negligence on the part of the deceased. The answer of the defendant railway company admitted that it had, with the permission of the city, erected and maintained crossing gates

at the intersection of its railway (which is laid on Poplar street) with Broadway, which is the iron structure referred to in the plaintiff's petition; that said crossing gate was located and erected by the direction, and under the supervision, of the duly authorized officials and agents of the city, and in pursuance of the requirements of the ordinance of said city duly enacted; that said crossing gate is a standard railway crossing gate, which was duly approved by the board of public improvements and street commissioner of the city before the same was erected in said Broadway, and that said structure, if an obstruction to said street, is a lawful one for which the defendant is not responsible. The answer then is a general denial of every allegation in the petition not expressly admitted, coupled with a plea of contributory negligence on the part of the deceased.

The replies to the answers were general denials.

The case made is this:

The defendant railway company has a track on Poplar street which runs east and west and crosses Broadway. Broadway runs north and south. On the 7th of April, 1893, the Municipal Assembly of St. Louis enacted an ordinance containing the two following sections:

"Section 1234. Every person, association or corporation running or operating engines or cars propelled by steam upon its railroad track or tracks, along or across any street, avenue or road in the city of St. Louis, now, or which may hereafter be used for wagon travel, shall erect, at all cross or intersecting streets, avenues or roads so used, or which may hereafter be used, a gate or gates, made of wood or iron or other suitable material, and unless said gates are opened and closed automatically, such persons, associations or corporations shall keep a watchman to operate such gate or gates who shall close the same immediately before the passage of any engine, car or train of cars, and

open the same immediately after such passage. Such gate or gates shall be so erected on such improved streets, avenues or roads, within thirty days after such person, association or corporation shall be notified so to do by the street commissioner of the city of St. Louis.

"Provided, however, that this ordinance shall not apply to any cross or intersecting avenues, streets or roads, that are now, or that may hereafter, be bridged over and across the railroad tracks;

"And provided further, that this ordinance shall not apply to any cross or intersecting streets, avenues or roads on which are laid tracks used exclusively for switching purposes or for switch tracks.

"Section 1235. Any person, association or corporation failing to observe and comply with the provisions of section twelve hundred thirty-four, shall be deemed guilty of a misdemeanor and upon conviction thereof, in the police court of the city, shall be fined not less than $100 nor more than $500 for each and every offense, and every day's violation thereof shall constitute a separate offense."

Pursuant to the requirements of said ordinance, and under written direction and authority of the city, the defendant railway company on the 8th of December, 1899, erected crossing gates at the intersection of Broadway and Poplar streets in the city of St. Louis. Such gates consisted of a mechanical appliance inclosed in an iron box at each of the four corners of the said intersecting streets. Such mechanical appliances were connected with and operated four wooden arms. The whole appliance was operated by a man, who had a station on one of said intersecting corners. On the approach of a train said arms were lowered so as to extend from each of said corners toward the center of the street and thus form a barrier or gate, as it is called, on each side of the railroad tracks. After the passage of a train, the operator, by use of said appliances, raised the arms to an upright position, thereby

leaving the street open for travel. The said box on the northwest corner of Poplar and Broadway, which is complained of in this case, was located inside of the street line. The box was two feet three inches in length, and was placed one foot east of the west curb line on Broadway. Outside of the east end of the box containing the mechanical appliance, there were placed two pieces of railroad iron, which were firmly embedded in the surface of the street, and extended upward and inward toward the said box, so as to afford a protection for said box containing such appliances, to prevent the same from being injured by collision therewith.

The whole projection, including said protection, extended five feet two inches eastwardly from the west curb line of Broadway. As above stated, there was one such box and protection on each of the four corners of Broadway and Poplar streets. Broadway is a very wide street, and between the outside limits of said boxes and their projections, there was a free, open space of thirty-nine feet for public use and travel. In the center of the street there is a double track electric street railway.

The city of St. Louis has a fire engine house located on the west side of Broadway opposite Valentine street, about two hundred feet north of Poplar street. In said engine house are located two fire engines, numbered 15 and 39, with their respective hose reels, and also a truck or hook and ladder. The engine No. 15 occupies the south room of the engine house. The truck or hook and ladder is stationed in the middle room, and engine No. 39, in the north room.

Under the rules of the fire department, when an alarm of fire comes from a portion of the city south of said engine house, it is the duty of engine No. 15, of which the deceased George Seibert was the driver, to leave the engine house first, cross Broadway to the east side thereof, so as to permit the truck or hook and ladder to come out of the engine house and go south-

wardly on the west side of Broadway ahead of the engine. When the truck has so proceeded, it is the duty of the driver of·engine No. 15 to recross Broadway to the west side thereof and proceed southwardly. Engine No. 39 then follows engine No. 15, and the hose reels follow the engines.

The deceased, George Seibert had been a driver of a beer wagon in the city of St. Louis for many years. For some time before the date of the accident, he had been a driver of a fire engine belonging to the city. For eleven days before the accident he had been the driver of engine No. 15. He lived at 2739 Arsenal street, which was south of the engine house, and at least once each day he went from the engine house southwardly to reach his home in order to get his meals.

The crossing gates at Broadway and Poplar were plainly visible from the engine house, at which the deceased was stationed. About three o'clock in the morning of May 11, 1900, an alarm of fire was sounded in the engine house, calling them to a fire south of Poplar street. Obedient to the rules of the department, the deceased drove engine No. 15 out of the engine house and across Broadway to the east side thereof. Seeing that the truck had not come out of the engine house, the deceased then recrossed Broadway to the west side thereof and proceeded southwardly at the rate of speed at which fire engines proceed in the city of St. Louis, which was as fast as the horses could run.

The engine weighed 9,700 pounds. There was an electric arc light suspended in the middle of the intersection of said streets, which lighted the locality so that the crossing gates and their appurtenances could be easily seen at a distance of from eighty to one hundred feet, and the light was burning at the time of the accident. When the engine reached the intersection of Broadway and Poplar streets the front wheel, on the right-hand side of the engine, struck the north fender or rail protecting the box containing the appliance for

operating the crossing gate, in consequence of which the driver, George Seibert, was thrown from the engine and received injuries from which he died.

For the purpose of this case this is a sufficient statement of the facts. At the close of the plaintiff's case and again at the close of the whole case the defendant demurred to the evidence. The court overruled the demurrers and the defendant excepted, and now relies chiefly upon the ruling of the trial court in this regard as ground for reversal of the case.

. I.

The crucial question in this case is, whether the construction and maintenance, by the defendant railroad company, of the safety gates, with the appliances for operating the same, together with the two bars of railroad iron protecting said boxes, all located inside of the street line, and constructed and maintained in obedience to the requirements of an ordinance of the city of St. Louis, constitute a nuisance on a public street, so as to render the defendant liable for damages caused by a collision therewith.

The general rule of law is, that the city has no power to place, or to cause or permit any one to place, a nuisance or obstruction upon a public highway, which renders the highway dangerous to travellers thereon. The question, therefore, in this case is, whether the erection and maintenance of the crossing gates, with their necessary appliances and protections, within the limits of the street, constitutes such an obstruction as to amount to a nuisance on the street within the meaning of the general rule of law stated. In other words, whether the city of St. Louis had the legal right to enact the ordinances hereinbefore set out, requiring the defendant railroad company to erect and maintain such crossing or safety gates, as a police regulation, and to authorize, or permit the same to be located within the lines of the street.

Counsel for defendant refer to paragraph 36 of section 5508, page 1280, Revised Statutes 1899, as authority for the maintenance of such gates. That statutory provision, however, has no application to this case. It is a part of the general statutes of the State relating to charters of cities of the second class, which confers upon the mayor and assembly of cities of the second class, power to require railroad companies to erect and maintain suitable gates at railway crossings, streets or alleys. This statutory provision has no application to the city of St. Louis, and is only valuable in this case so far as it expresses the general policy of the State with reference to such police regulations.

The power of the city of St. Louis in this regard is to be found in paragraphs 2, 11, and 14 of section 26 of article 3 of the city charter. Paragraph 2 confers the power upon the mayor and assembly, "to establish, open, vacate, alter, widen, extend, pave, or otherwise improve and sprinkle all streets, avenues, sidewalks, . . . and to regulate the use thereof." Paragraph 11 confers the power, *inter alia*, to grant to persons or corporations the right to construct railways in the city, . . . and to regulate and control the same as to their fares, routes and frequency of trips, and the repair of their tracks and the kind of their rails and vehicles. Paragraph 14 confers power to pass all ordinances, not inconsistent with the provisions of the charter or the laws of the State, as may be expedient in maintaining the peace, good government, health and welfare of the city.

These express grants of power are ample to support the ordinance requiring the erection of such safety gates where railroads cross public streets. But without such express grants, the power to pass such police regulations is an inherent power necessary for the protection of the lives and persons of the citizens using the public streets.

It is the duty of a city to take all such steps and precautions as are reasonably necessary to render its streets reasonably safe for use by citizens. There can be no two opinions that safety gates where railroads cross public streets are a necessary protection against accidents, and do not constitute a nuisance upon the street.

In Belcher Sugar Refining Co. v. St. Louis Grain & Elevator Co., 101 Mo. 204, in speaking of structures on public highways (in that case it was an elevator on a public wharf), the court said: "We do not say that the State has the power to confer upon the city the right to turn the wharf to purely private uses, or to charge it with burdens not contemplated by the condemnation, without additional compensation; but there is a wide field over which the Legislature is supreme, and many structures may be justified under legislative sanction which would otherwise be a nuisance."

A safety gate at a point where a railroad crosses a public street is in no sense a private use of the street, but is clearly a police protection against injuries to persons passing along the street, in consequence of the passage of railway trains over the same, and such gates, therefore, cannot in any proper sense be said to be a nuisance on the street. It goes without saying that such gate must be closed and opened by machinery, and that such machinery must operate either automatically or by human agency. In either event there must be a permanent displacement of as much of the street surface as is necessary for the occupancy of such machinery. Whether the operating machinery shall be placed within the limits of the street, that is, between the curb lines of the street, or on the sidewalk, which constitutes a part of the street in the legal acceptation of the term "street," is a question resting largely within the discretion of the municipal authorities, and the courts will not interfere therewith, nor condemn the municipal action in respect to the place where said ma-

chinery is located, unless the presence on the street of such machinery or appliances necessarily interferes with the use of the street as a public highway. As there were thirty-nine feet of clear, unobstructed space left in the highway between the boxes and protections thereof in this case, it cannot be said that the machinery, appliances and protections necessarily interfere with the use of Broadway as a public highway.

As stated, a street, in the legal acceptation, includes the portion provided for the passage of vehicles and also the sidewalks provided for the use of pedestrians. The location of such appliances on the sidewalk impairs the use of the sidewalk for pedestrians, to a certain and perhaps greater degree than the location thereof within the space allotted for the passage of vehicles impairs the use of that portion of the street for the use of the public. Wherever such appliances are located, they necessarily withdraw as much of the street as they permanently displace from public use. But inasmuch as such gates are not only useful but necessary for the protection of the lives of the people, their presence on the street is not an unlawful use of the street for that purpose, nor do they constitute a nuisance, within the legal meaning of the term.

The identical question here involved does not seem to have undergone judicial determination in this State. But the principle involved has been considered and applied with reference to other obstructions on a street, and it has uniformly been held that where the obstruction constitutes a necessary incident to the use of the street for the purposes authorized by law, or where they, as here, are intended for the protection of the general traveling public, they do not constitute a nuisance.

The principle has been applied to piers and abutments on a street or highway for a bridge, and it has been held that the places on the street where such piers shall be located are properly determinable by the mu-

nicipal authorities. [Cardwell v. Bridge Co., 113 U. S. 209; Smith v. Alabama, 124 U. S. 481.]

The same principle has been applied in reference to the construction of a bridge over a navigable stream of water, thereby rendering the navigation more hazardous, but the bridge affording greater facilities to the traveling public. [Miller v. Mayor of New York, 109 U. S. 385.]

The erection of a pier in 'a street to support the end of a bridge, crossing the Missouri river at Kansas City, Missouri, for railroad and wagon travel and for the use of pedestrians, was held by this court not to be a nuisance in the street, in Gates v. Bridge & Terminal Co., 111 Mo. 28.

The placing of telegraph and telephone poles in a sidewalk on a street, whereby a certain portion of the street was permanently withdrawn from use by the public, has been held not to be a nuisance on the street. [Julia Building Assn. v. Bell Telephone Co., 88 Mo. 266; Gay v. Telegraph Co., 12 Mo. App. 486.]

Speaking of the liability of a city for acts or neglects of its officers, with respect to the performance of duties imposed for the public benefit, and not for profit or special privileges to the municipal corporation, Cooley in his work on Constitutional Limitations (6 Ed.), page 256, says: "And as the State is not responsible for the acts or neglects of public officers in respect to the duties imposed upon them for the public benefit, so one of these corporations is not liable to private suits for either the non-performance or the negligent performance of the public duties which it is required to assume, and does assume, for the general public, and from which the corporation itself receives neither private nor special privilege. And the same presumption that legislative action has been devised and adopted on adequate information and under the influence of correct motives, will be applied to the discretionary action of municipal bodies, and of the State

Legislature, and will preclude, in the one case as in the other, all collateral attack." If, therefore, the city of St. Louis had erected these crossing gates for the benefit of the general public there can be no question that the municipal corporation would not be liable to a private action such as this. Instead of erecting such gates itself, the city, under its police power, required the defendant company to erect them. As the city could not be held liable for so doing, it follows logically, that the defendant could not be held liable for doing that which the city was under obligation to its citizens to do, and which it required the defendant to do instead of doing it itself.

The duty and right and power to erect such gates carries with it a discretion to determine where such gates shall be erected, and the character of the gates to be erected. This discretion is not subject to judicial review or control, unless it is so exercised as to amount to a practical destruction of the street for street purposes, or to a virtual withdrawal of the street from public use, such as was the case with Dubach v. Railroad, 89 Mo. 488, and Lockwood v. Railroad, 122 Mo. 98. Cases like Schopp v. St. Louis, 117 Mo. 131, have no application to cases of this character, for the reason that the use authorized in that case was for private benefit and not for public good.

The petition in this case charges that the structures, including the iron rails or barriers, were located by the defendant, under authority of the city of St. Louis, and the answer charges that they were placed there in obedience to an ordinance, and pursuant to the direction of the proper city authorities. As above stated, there was a clear, unobstructed roadway thirty-nine feet in width between such structures for the use of the traveling public. The uncontradicted testimony shows that there was an electric arc light suspended in the middle of the intersection of Broadway and Pop-

lar streets, which lighted the locality so thoroughly that the structure could be plainly seen at a distance of from eighty to one hundred feet therefrom; that the structure was within two hundred feet of the engine house at which the deceased was stationed, and that he had passed the same at least once in response to a fire alarm before the time of the accident, and had passed it many times in going from the engine house to his home, which was located south thereof.

Under these facts there can be no room for doubt that anyone could have safely driven over the street while exercising any degree of care whatever, without incurring the slightest liability to danger from such obstruction, and that the deceased knew, or by the exercise of ordinary care could have known, of the existence of such structure on the street, and by the exercise of like care could have avoided a collision therewith. There is no question that the structures were proper structures and were of the character and kind usually employed for such purposes.

The conclusion is, therefore, inevitable that the structures were not a nuisance on the street; that the defendant placed them there in obedience to a positive requirement of a municipal regulation, enacted under the police power conferred by the State upon the city of St. Louis for public benefit and protection, and that they did not constitute such an obstruction on the street as unnecessarily impaired its usefulness as a street or such as would cause injury to anyone using the street while exercising ordinary care. It is likewise apparent that the presence of the structure on the street could not have inflicted the injury complained of, if the deceased had used even the slightest degree of care in the management of his engine and team.

Upon the whole case made, therefore, it follows

that the trial court erred in overruling the demurrers to the evidence, and in permitting the case to go to the jury at all. The judgment of the circuit court, is therefore, reversed.

All concur.