[No. 11908. Department One. January 8, 1915.]

GEORGE W. DETAMORE *et al.*, *Appellants*, v. W. J. HINDLEY *et al.*, *as Commissioners etc.*, *Respondents*, CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, *Intervener and Respondent*.[1]

CONSTITUTIONAL LAW—POLICE POWERS—DELEGATION. Const., art. 11, § 11, authorizing cities to make and enforce within their limits all such . . . police . . . and other regulations as are not in conflict with the general laws is a direct delegation of the police power, as ample within its limits as that possessed by the legislature.

RAILROADS—CHANGING GRADE CROSSINGS—POLICE POWER. It is a legitimate exercise by a city of the police power to require a separation of grades where a public service railroad crosses a city street, and is in accord with general laws (Rem. & Bal. Code, §§ 7507, 7510).

MUNICIPAL CORPORATIONS — FRANCHISES — ULTRA VIRES—RAILWAY BRIDGES OVER STREETS. Under the delegation of police powers to cities conferred by art. 11, § 11, of the state constitution, and under Rem. & Bal. Code, §§ 7507, 7510, conferring power upon cities of the first class to authorize and regulate the construction and operation of railroads within the corporate limits, to construct and keep in repair bridges, viaducts and tunnels, to authorize the location, construction and operation of railroads "in, along, over and across any highway" or street, the action of the city in granting a franchise

[1] Reported in 145 Pac. 462.

ordinance to a railway to construct bridges over certain streets is not *ultra vires* as being in excess of corporate powers; since not only the power to compel the separation of street grades at railroad crossings is a legitimate exercise of the police power, but authority is expressly conferred by the employment of the word "over" in conjunction with "in, along and across," in the statute authorizing the grant of such ordinances.

SAME—STREETS—REGULATION AND CONTROL—REVIEW BY COURTS. Since the power to require grade separations for streets and railways exists as an integral part of the police power of the city, the appropriate means to its exercise rests largely in the discretion of the city's governing body, and, in the absence of a clear abuse, will not be interfered with.

SAME—USE OF STREETS—RAILROAD BRIDGES. There is shown a reasonable necessity for supports for overhead railway bridges requiring spans across the street more than forty feet in length, although it was possible to construct bridges without such supports, where the franchise required bridges without supports only in case the span would be less than forty feet, and where it appears the location was sparsely settled, the widest piers were three feet and one-half in thickness, and left passageways for vehicles from twenty-two to sixteen feet in width on each side of the central pier, and sidewalk space on both sides of the street eleven and one-half feet in width over the graded streets.

Appeal from a judgment of the superior court for Spokane county, Blake, J., entered November 24, 1913, upon granting a nonsuit, dismissing an action for a writ of mandate, after a trial to the court. Affirmed.

*Skuse & Morrill,* for appellants.

*F. M. Dudley (H. M. Stephens, W. E. Richardson,* and *Geo. W. Korte,* of counsel), for respondents.

ELLIS, J.—In this action, the plaintiffs sought a writ of mandate requiring the defendants, commissioners of the city of Spokane, to cause to be removed from Erie, Ivory, Denver, Perry, Hogan, Helena, Madelia, Magnolia, Pittsburgh and Napa streets, in that city, the supports of certain bridges or overhead crossings maintained therein by the intervener, Chicago, Milwaukee & St. Paul Railway Company for its railroad tracks.

The case was tried upon a statement of agreed facts in substance as follows: In January and May, 1910, the Chicago, Milwaukee & Puget Sound Railway Company, predecessor in interest of the intervener, applied for certain franchise ordinances permitting the crossing of the streets in question with its tracks to be laid at grade. The city council refused to grant the application, but required that the tracks be carried over the streets in the manner specified in two ordinances finally passed on June 14, 1910, and February 23, 1911. These ordinances are in evidence. They prescribe the manner in which the bridge or viaduct crossing each of the streets in question should be constructed. These provisions we shall not notice more specifically, since it is not claimed that the actual structures do not conform to the ordinances. These ordinances then provide that the bridges or viaducts shall be constructed either of steel or concrete, or a combination of these, and shall preserve such width of roadway and sidewalks as may be determined by the city council, but that, if the bridges be made of steel, they shall be constructed without center posts unless the span extending over the street from curb to curb is more than forty feet in length. It is further provided that the grantee shall be permitted to erect temporary wooden viaducts which shall be replaced by permanent structures as required by ordinance within three years.

After receiving the franchise, and prior to constructing its road, the Puget Sound Company filed with the city council plans, specifications, and profiles showing the elevations of the bridges and viaducts which it proposed to construct. These were approved by the city council. The intervener, by an assignment of the franchise ordinance, has succeeded to all the rights of the Puget Sound Company in the premises.

Between December 1, 1911, and January 1, 1913, all the bridges were completed. Those over Denver, Perry, Hogan, Helena and Madelia streets were constructed of

reinforced concrete.  Those over Pittsburgh, Magnolia, Erie and Ivory streets were of wood.  The tracks were carried over Napa street on a wooden bridge previously constructed by and belonging to the Spokane & Inland Empire Railroad Company.  It is admitted that the additions to this bridge made necessary by its use by the intervener do not materially add to the obstruction of the street.

The bridge over Denver street is typical of the concrete structures.  It is supported by three rows of concrete piers, one in the middle and one on each side of the street at the curb line.  There are four piers in each row twenty feet in height over the roadway, the base of the center piers in the middle of the street being three feet six inches wide and thirty feet eight inches in length, lengthwise of the street. The piers on each side of the street at the curb line are on bases two feet seven inches wide, and twenty-seven feet in length, lengthwise of the street.  Between the center piers and the curb line piers on each side, is a clear roadway of twenty-two feet.  Between the curb line piers and the property line, on each side, is a clear sidewalk space of eleven feet six inches.

The wooden bridges follow the same general plan.  The clear roadways on each side of the central supports vary from sixteen to over twenty feet, save that on Ivory Street there is a single clear driveway over thirty-three feet wide between the bents.  Neither of the streets crossed by the temporary wooden bridges has ever been graded, save such grading as was done by the railroad company in constructing the bridges.  Bridges without supports resting in the streets would have required a span in each instance of much over forty feet in length.

The total cost of all these bridges was approximately $110,000.  The plaintiffs had notice and knowledge that the bridges were being constructed but made no complaint to any one until the month of May, 1913, more than five months after they were all completed.

In addition to the stipulation, the plaintiffs offered in evidence a picture of another bridge crossing a street with a span of over eighty-four feet. This was offered for the purpose of showing the practicability of constructing the bridges in question without supports in the street. The offer was refused.

When the plaintiffs had rested their case, the defendants and intervener moved for a dismissal for the reasons, among others, that none of the structures complained of are unlawful, and that the plaintiffs by their laches are estopped from maintaining their action. The motion was granted in its entirety and the action was dismissed. The plaintiffs have appealed.

The briefs take a wide range and discuss many interesting questions, but the principal contention of the appellants is that the provisions of the franchise ordinances, authorizing the carrying of the railroad tracks over the streets on bridges having supports within the street lines, are *ultra vires*. This presents a question going to the very basis of the case. If the power exists and was not abused, the writ was properly denied, and a consideration of the other questions becomes unnecessary.

It is admitted that the legislature has the power to confer upon a municipality the authority to authorize the placing of these supports in the street. It is conceded that the city has sufficiently authorized them, if it has been so empowered. The one vital question, therefore, is: Has the requisite power been granted to the municipality? The answer must be found in the fundamental and statutory law of this state.

The state constitution, § 11 of article 11, provides:

"Any county, city, town, or township, may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws."

This is a direct delegation of the police power as ample within its limits as that possessed by the legislature itself. It requires no legislative sanction for its exercise so long as

the subject-matter is local, and the regulation reasonable and consistent with the general laws. *Odd Fellows' Cemetery Ass'n v. City and County of San Francisco*, 140 Cal. 226, 73 Pac. 987.

Where a public service railroad crosses the streets of a city, the power to compel the separation of grades and to authorize means to that end, not unreasonably impairing the use of the street by the public, is a legitimate exercise of the police power so conferred in the interest of the public safety. Any change in the street so necessitated is a public use. *Spokane v. Spokane & I. E. R. Co.*, 75 Wash. 651, 135 Pac. 636; *Spokane v. Thompson*, 69 Wash. 650, 126 Pac. 47.

Such an exercise of the broad police powers by a city is not only not in conflict with the general laws of this state, but is in direct accord with them. The statute defining the powers of cities of the first class, Rem. & Bal. Code, § 7507 (P. C. 77 § 83), declares:

"Any such city shall have power   .  .  .

"(9)   To authorize or prohibit the locating and constructing of any railroad or street railroad in any street, alley, or public place in such city, and to prescribe the terms and conditions upon which any such railroad or street railroad shall be located or constructed; to provide for the alteration, change of grade, or removal thereof; to regulate the moving and operation of railroad and street railroad trains, cars, and locomotives within the corporate limits of said city; and to provide by ordinance for the protection of all persons and property against injury in the use of such railroads or street railroads;   .  .  .

"(12)   To construct and keep in repair bridges, viaducts and tunnels, and to regulate the use thereof;"

By an act of 1907, Rem. & Bal. Code, § 7510 (P. C. 77 § 1201), the legislature further declared:

"Any city of the first class shall have the power by ordinance to authorize the location, construction and operation of railroads in, along, over and across any highway, street, alley or public place in such city, for such term of years and

upon such conditions as the city council of such city may by ordinance prescribe. . . ."

It will be noted that these provisions relate to commercial as well as street railroads. It will also be noted that, by the statute last quoted, the power is given to authorize their location, construction and operation, not only along and across the street or highway, but also *over* it. The authority conferred by subdivision 9 of § 7507: "to prescribe the terms and conditions upon which" the railroad may be constructed, coupled with the authority "to provide by ordinance for the protection of all persons and property against injury in the use of such railroads," is clear authority, if any were needed in addition to that granted by the constitution, to provide for a grade separation by carrying the tracks over or under the street. Moreover, the grant contained in § 7510 of the power to authorize the location, construction and operation of railroads "in, along, over and across any highway, street, alley, or public place in such city . . . upon such conditions as the city council of such city may by ordinance prescribe" is clear and explicit.

It is plain that these statutes empower the city to authorize the construction of railroads in the streets longitudinally as well as transversely. Such is the clear import of the words "along and across." *Cook County v. Great Western R. Co.,* 119 Ill. 218, 10 N. E. 564.

In fact we have held that a statute giving power to cities of the fourth class to authorize the laying of tracks on the streets, without the use of the words "along and across" (Rem. & Bal. Code, § 7731, subd. 13; P. C. 77 § 389), confers the power to authorize a longitudinal as well as a transverse construction. *State ex rel. Sylvester v. Superior Court,* 64 Wash. 594, 117 Pac. 487. But the act of 1907, Rem. & Bal. Code, § 7510, uses the word "over" in direct conjunction with the words "along and across." In view of the clear power to authorize the laying of tracks both lengthwise and across the street, and the clear police power to compel a

separation of grades in the interest of public safety, it cannot be doubted that the legislature used the word "over" advisedly with the intent to confer power to authorize an overhead construction. We have so construed the word "over" in practically the some connection as used in the statute, Rem. & Bal. Code, § 9080 (P. C. 405 § 327), relating to the authorization of the construction of railroads of which the motive power is other than steam. *State ex rel. Ford v. Superior Court*, 67 Wash. 10, 120 Pac. 514.

It is true that, in that case some stress, *arguendo*, was laid upon the power given by the statute to prescribe "the grade or elevation at which the same shall be maintained or operated," but it is clearly held that the controlling words of the statute, even extending the meaning of the words last quoted, are the words "upon, over, along and across," coupled with the further provision giving the city power to prescribe "the terms and conditions" upon which such roads shall be constructed and operated. This is made plain by the following language:

"The relators say: 'The conferring of the power to prescribe the grade or elevation simply means that the legislature has said to the city council that you may have the power and authority to protect the inhabitants of the city whom you represent officially against any public service corporation, attempting to fix its line at an improper grade or elevation.' This argument is hardly in harmony with the contention that the city had no power to permit the construction of the road except upon the surface of the street. Moreover, such authority had already been conferred upon the council by the use of the words 'upon, over, along and across' and by the further provision giving it the power to prescribe 'the terms and conditions' upon which such roads shall be constructed, maintained, and operated."

Any other construction of the statute would make the word "over" superfluous. Statutes should, if possible, be so construed as to give every word its true significance. *Crozer v. People*, 206 Ill. 464, 69 N. E. 489.

So far as the question here involved is concerned, the controlling provisions of the two statutes, Rem. & Bal. Code, §§ 7510 and 9080, are practically identical. No just distinction can be found in the fact that the one relates to commercial railroads employing steam as the motive power and the other to street railroads employing electric or any motive power other than steam. In fact, conceding as we must, the power of the city to authorize the construction of both kinds of roads upon, along and across its streets, the necessity for the exercise of the police power by requiring a grade separation is obviously more imperative in the case of a steam road than of any other. It is clear that both the terms of the statute and the reasons for its enactment sustain the view that cities of the first class are empowered to authorize a separation of grades where commercial railroads are constructed either along or across the streets.

Whatever argument in favor of the city's power can be drawn from the condemnation statutes in the case of street railroads, is equally present in the case of commercial roads. By an act of 1903 (Laws of 1903, page 383) § 4334 of Ballinger's Code was amended so as to grant the power to railway companies to appropriate by condemnation "rights of way for tunnels beneath the surface of the land and any elevated rights of way above the surface thereof." This statute was reenacted in 1907 (Rem. & Bal. Code, § 8740; P. C. 405 § 85) by the same legislature which enacted § 7510, above quoted, giving express power to cities of the first class to authorize railway companies to construct their tracks "in, along, over and across" any street. True, the power of eminent domain cannot be exercised to appropriate the interest of the abutting landowner in the street until a franchise to use the street itself has been secured from the city. *State ex rel. Sylvester v. Superior Court, supra.* But that is equally true of an appropriation by a street railway company if it involves an injurious change of grade. It seems to us that the parallel is complete.

Since the power to require the grade separation exists as an integral part of the police power of the city, the appropriate means to its exercise must rest largely in the discretion of the city's governing body. The courts will not interfere with that discretion in the absence of a clear abuse. *Wabash R. Co. v. City of Defiance*, 52 Ohio St. 262, 40 N. E. 89 ; *Murphy v. Chicago R. I. & P. R. Co.*, 247 Ill. 614, 93 N. E. 381. Piers reasonably necessary to that purpose and authorized by the city are not nuisances that can be enjoined. by an owner whose property abuts on the street. *Gates v. Kansas City Bridge & Terminal R. Co.*, 111 Mo. 28, 19 S. W. 957 ; *Summerfield v. Chicago*, 197 Ill. 270, 64 N. E. 490 ; *Village of Winnetka v. Chicago & M. Elec. R. Co.*, 204 Ill. 297, 68 N. E. 407 ; *Seibert v. Missouri Pac. R. Co.*, 188 Mo. 657, 87 S. W. 995, 70 L. R. A. 72 ; *Miller v. Long Island R. Co.*, 17 Fed. Cas. No. 9,580, p. 332.

The appellants place their chief reliance on the decision of this court in *State ex rel. Schade Brewing Co. v. Superior Court*, 62 Wash. 96, 113 Pac. 576, in which we used language to the effect that a city of the first class in this state has no power to grant to a railway company the right to appropriate any part of the street to the entire exclusion of the public, and in effect that the granting of a franchise purporting so to do was *ultra vires*. The language used in that case, however, must be construed with reference to the facts of that case. There, one-half of the street for a distance of several hundred feet was surrendered to the absolute and exclusive use of the railroad company, not merely the space for supports for overhead crossings in aid of the safe use of the street by the public. The action of the city in that case could not be sustained by a reference to the police power. In that case there was an absolute surrender of a very material part of the street to serve alone the private use of the railroad company. Here no very material part of the street's surface is obstructed and that only to make the joint use of the street by the railroad company and the public

reasonably safe. The use of so much of the street for the base of such supports as may be reasonably necessary to carry the railroad tracks over the street in order to obviate the danger and inconvenience to the public of a grade crossing is not, in any just sense, a surrender of any portion of the street to the exclusive use of the railroad company. What is a material portion of a street is, of course, a relative matter. Three feet of the street's surface might be a very material encroachment in some localities and of little practical moment in others. The section of the city here in question is sparsely settled, and many of the streets are as yet not graded. Viewed in the light of the circumstances and conditions, the obstructions here in question are only technical obstructions. In view of the broad police powers of the city conferred by the constitution, and in view of the clear authority conferred by statute upon cities of the first class to authorize a separation of grades, where railroads are permitted to occupy the streets, we are constrained to hold that the authorization of the structures here in question was a valid exercise of the police power of the city and not an abuse of its discretion. While it may be true that nearly all of these bridges could have been constructed with a single span crossing the street and that the supports in the streets were, therefore, not absolutely necessary, still, since all of the spans would have exceeded forty feet, it is clear that the supports were reasonably necessary. In view of the end to be gained, namely the safe use of the streets, we think that a reasonable necessity is all that should be required.

Upon mature consideration, it seems to us that the true distinction, between the *Schade* case, on the one hand, and the *Ford* case and this case, on the other, is to be found in the fact that, in the *Schade* case, there was a clear abuse of the city's discretion and an improper exercise of its police powers, while here, there is no abuse of discretion, but a clearly proper exercise of that power.

Any attempt to review the many authorities cited by appellants from other jurisdictions would uselessly extend this opinion. They are nearly all distinguishable on the facts, and in those which are not so distinguishable there was apparently lacking the broad police power conferred upon cities of the first class in this state or the express statutory power to permit the construction of railroads over the streets.

A persuasive argument is advanced by the respondents tending to sustain the courts' decision on the ground of the appellants' laches in making no complaint until the intervener had expended over $100,000 on the faith of its franchise. We prefer, however, to base our decision upon the broad ground of the police power, and the express statutory authority.

The judgment is affirmed.

CROW, C. J., GOSE, CHADWICK, and MAIN, JJ., concur.