[No. 25022.  *En Banc.*  December 6, 1934.]

MORRIS D. PATTON, *Appellant,* v. THE CITY OF BELLINGHAM *et al., Respondents.*[1]

[1]Reported in 38 P. (2d) 364.

*Harrison McAdams,* for appellant.

*Hobart S. Dawson* and *Tim Healy,* for respondents.

*Joseph P. McDermott* and *Charles Whitman, amici curiae.*

STEINERT, J.—This action was brought to test the constitutionality and validity of a statute and an ordinance, respectively, restricting the hours of opening and closing barber shops. Upon the commencement of the action, an order temporarily restraining enforcement of the ordinance was obtained. A subsequent trial before the court resulted in findings and conclusions, based upon which a decree was entered dissolving the temporary restraining order and denying any relief under the complaint. This appeal followed.

The statute involved reads as follows:

"The governing body of any city of the first, second, third and fourth class in the state shall have power to regulate and fix by ordinance the hours and time of opening and closing of barber shops on week days [and] to provide that any violation of such ordinance shall be a misdemeanor, and to fix and enforce penalties within the limit of the jurisdiction of such cities for such violation." Ch. 120, Laws of 1933, p. 448, Rem. 1934 Sup. § 9213-2 [P. C. § 427g].

Bellingham is a city of the first class. Pursuant to the passage of the above act, the city, through its council and mayor, enacted ordinance No. 5363 (amending ordinance No. 5333), which provided, among other things, that it should be unlawful to open a barber shop earlier than eight o'clock a. m. or to close the same later than six o'clock p. m. on week days other than Saturdays, or to close it later than seven o'clock p. m. on Saturdays or days preceding a holiday. The

ordinance further provided for inspection of barber shops by a sanitary inspection board, or any of its members, for the purpose of ascertaining their sanitary condition. By ordinance No. 5333, violation of the provisions relating to opening and closing, or refusal to permit inspection, subjected the person convicted thereof to a fine or imprisonment, or both.

Appellant owns and operates a barber shop in the Henry Hotel Building in Bellingham. He himself works as a barber in the shop, and also employs, under oral contract, an additional barber therein. For several years, appellant has kept his shop open from eight a. m. to eight p. m. on all week days except Saturdays, and from eight a. m. to nine p. m. on Saturdays and days preceding holidays. His employee, however, works only from ten a. m. to closing time, with an hour off for lunch and a half hour off for dinner, making his total working time eight and one-half hours on ordinary days and nine and one-half hours on Saturdays and such days as precede holidays. Shops in Bellingham under the union rule are open from eight a. m. to six p. m. on ordinary days, and from eight a. m. to seven p. m. on Saturdays and days preceding holidays. The actual working time per day of appellant's employee is a half hour less than that of employees in union shops.

Appellant's shop is patronized by all classes of customers, including traveling salesmen, highway workers, road construction employees, mill workers, tourists, clerks, professional men and farmers, many of whom can not, or at any rate do not, have their barber work done until after six or seven o'clock in the evening. So far as appellant is concerned, at least one-third of his business is done after the closing hours specified in the ordinance.

Evidence was introduced by both parties relative

to the effect upon the barber business of keeping shops open beyond the time limited by the ordinance. The evidence was necessarily expressive of the opinion of the various witnesses, and naturally their opinions differed materially. The court made findings to the effect that the earnings of barbers in Bellingham did not, at that time, exceed from six to fifteen dollars a week; that extending the opening and closing hours generally throughout the city would not materially increase their revenue; that, if a few shops remained open after a fixed hour, all others would be required to do likewise, thus necessitating the same employees to be kept in attendance the entire day and thereby increasing their hours of labor; that it was impracticable and unworkable to operate barber shops on a split-shift system; that long working hours, with the attendant fatigue, decreased the efficiency and injured the health of the barber, and therefore led to unsatisfactory and unsanitary conditions and inefficient workmanship and methods; and that the only practical way of limiting the hours of labor of the barber was by limiting the hours during which barber shops should remain open.

As already stated, the evidence on which these findings were based was opinionative in nature. Obviously, the findings did not, in their entirety, constitute a determination of existing facts, but were, in part at least, a prognostication by the court itself of what would be the probable result of the continuance of existing conditions. We mention this here and now because, in deciding this case, we do not take issue with the trial court in that which is intrinsically factual, but only in that which is a matter of deduction.

Appellant, by his assignments of error, makes the contention that the statute and ordinance in question violate the following constitutional provisions:

(a) Art. 1, § 10, of the Federal constitution, and Art. 1, § 23, of the state constitution, relating to the impairment of contracts; (b) amendment 14, § 1, of the Federal constitution and Art. 1, §§ 3 and 12 of the state constitution, relating to equal protection, abridgment of privileges, and due process of law.

In presenting this case to us on appeal, both parties go upon the theory that, in the enactment of, and in the attempt to enforce, the ordinance in question, the city was proceeding under its police powers. Accepting that theory, it becomes unnecessary for us to consider or pass upon the constitutionality of the statute, for whatever authority the city has in respect of its police powers, it has by virtue of Art. XI, § 11, of our constitution, independent of any statutory grant. Commenting upon that provision of the constitution, we said in *Detamore v. Hindley,* 83 Wash. 322 (326), 145 Pac. 462:

"This is a direct delegation of the police power as ample within its limits as that possessed by the legislature itself. It requires no legislative sanction for its exercise so long as the subject-matter is local, and the regulation reasonable and consistent with the general laws."

The following cases are to the same effect: *Sherman, Clay & Co. v. Brown,* 142 Wash. 37, 252 Pac. 137; *Seattle v. Ford,* 144 Wash. 107, 257 Pac. 243; *Seattle v. Gervasi,* 144 Wash. 429, 258 Pac. 328; *Bungalow Amusement Co. v. Seattle,* 148 Wash. 485, 269 Pac. 1043, 60 A. L. R. 166; *Brennan v. Seattle,* 151 Wash. 665, 276 Pac. 886. It is not contended, nor do we apprehend that it could be, that the purpose of the statute was to confer authority upon the city to prescribe regulations other than such as are "reasonable and consistent with the general laws."

It will be observed that the legislature has not at-

tempted by the statute directly to prescribe or enforce any such regulations as are set forth in the ordinance. Whether the legislature could legally have done so is a question that it is not necessary to decide here.

Confining ourselves, then, to the ordinance and its effect, we have no hesitancy in saying, first, that the provisions found therein, with reference to the inspection of barber shops, constitute a valid exercise of the city's police power, and, as such, were reasonable and proper.

In *State v. Sharpless,* 31 Wash. 191, 71 Pac. 737, 96 Am. St. 893, there was involved the constitutionality of a statute which made it unlawful for any person either to follow the occupation of barbering without having first obtained a certificate of registration, or, following it, to fail to heed certain sanitary requirements. It was said in the course of the opinion that the legislature may authorize cities and towns to regulate the occupation of barbering therein, or to regulate any occupation affecting the health and morals of the community.

In *State v. Walker,* 48 Wash. 8, 92 Pac. 775, the same statute was again questioned, and the court in the course of its opinion remarked that the occupation of barbering fell within that class of trades, professions or callings which may be regulated by law "for public health, comfort and safety," and not within that class which may not be so regulated without depriving a citizen of his natural rights and privileges guaranteed him by fundamental law. In the same case, however, it was held that the provision requiring the applicant to have "studied the trade for two years as an apprentice under or as a qualified and practicing barber in this state or other states," was unreasonable and arbitrary, and therefore void. It will be observed that, while these two cases hold that the legislature may

grant police powers to cities, later cases, already cited herein, affirm the principle that cities have such powers, fully and amply, by virtue of the constitution, and independent of any grant by the legislature.

The grant of police power to a city carries with it the necessary implication that its exercise must be reasonable. *Detamore v. Hindley,* 83 Wash. 322, 145 Pac. 462; *Seattle v. Ford,* 144 Wash. 107, 257 Pac. 243; *State v. Spiller,* 146 Wash. 180, 262 Pac. 128; 2 Dillon on Municipal Corporations (2d Ed.), § 589; 43 C. J. 213, 228. Where the provisions of an ordinance are more specific and detailed than the expression of general power conferred, the court will determine the reasonableness of such provisions. 2 McQuillan on Municipal Corporations (2d Ed.), § 762.

The question, then, presents itself here whether the provision with reference to the time of opening and closing barber shops is reasonable and proper for the protection of the health and general welfare of the public, or whether it is unreasonable and arbitrary and an unlawful interference with the rights of the individual.

Whether the facts of a particular case warrant the assertion of police power is a judicial question to be resolved by the courts. *Bowes v. Aberdeen,* 58 Wash. 535, 109 Pac. 369, 30 L. R. A. (N. S.) 709; Freund, Police Power, § 142; 2 Dillon on Municipal Corporations (2d Ed.), § 599. In *Seattle v. Ford, supra,* we said, on p. 110:

"The courts will go far in sustaining the exercise of the police power for the preservation of the public health and safety, and in so doing private rights in conflict therewith are overridden; but on the other hand, the courts are equally concerned to see that, under the guise of protecting the public, private business—especially that carried on upon private property—is not arbitrarily restricted or interfered with."

In *Brown v. Seattle,* 150 Wash. 203, 272 Pac. 517, there was involved the validity of a city ordinance which provided that it should be unlawful for any meat shop to keep open for business on any day except between the hours of seven a. m. and six p. m. Holding that such provision was unconstitutional as being an unreasonable interference with the rights of the plaintiff therein, we said, on p. 211:

"Regulatory legislation attempting to control a lawful business which does not fall within the objectionable or prohibitable classes, and which is conducted upon private property, must be reasonably adapted to promote the public health and general welfare in some particular manner, and must tend to prevent some existing or directly anticipated menace thereto. What is a reasonable exercise of the police power under these circumstances depends largely upon the nature or character of the undesirable conditions to be overcome or prevented. *Whyte v. City of Sacramento,* 65 Cal. App. 534, 224 Pac. 1008. There must also be some logical connection between the object sought to be accomplished by the legislation and the means prescribed to accomplish such purpose."

Numerous authorities are cited in the *Brown* case supporting the above quotation, to which may be added the case of *Mugler v. Kansas,* 123 U. S. 623, 8 S. Ct. 273, 31 L. Ed. 205.

While the interest of the public may be likened unto an irresistible force which compels where it requires, it nevertheless must, under constitutional provisions, both Federal and state, respect the rights of the individual. While the latter may not occupy the fixity of an immovable object, they nevertheless have the protection and sanction of the fundamental law of the land, and they recede before no less a force than that of public necessity.

"To sustain the individual freedom of action contemplated by the Constitution, is not to strike down

the common good but to exalt it; for surely the good of society as a whole cannot be better served than by the preservation against arbitrary restraint of the liberties of its constituent members." *Adkins v. Children's Hospital*, 261 U. S. 525 (561), 43 S. Ct. 394, 67 L. Ed. 785, 24 A. L. R. 1238.

The occupation of barbering is a lawful business, and so far from being an obnoxious one, it is now considered well-nigh indispensable. It may be conceded, as we have already conceded, that its relation to the public is such as to render it amenable to proper regulation, to the end that the public may be protected against the spread of communicable diseases and unsanitary practices. In so far as the ordinance seeks to require that such shops shall be operated in a clean and sanitary manner, and by clean and competent barbers, it is a wholesome measure and a valid exercise of the police power. But in our opinion, the avowed object of the ordinance bears no real or substantial relation to the reasonable protection of the public. It belongs, rather, in the category of unreasonable restrictions upon the right of a citizen to engage in a useful and lawful calling and to acquire and possess property and to so use it as will not interfere with the rights of others. The ordinance seeks not merely to regulate a business, but to dictate its operation.

"The right to labor or earn one's livelihood in any legitimate field of industry or business is a right of property, and any lawful or unreasonable interference with or abridgment of such right is an invasion thereof, and a restriction of the liberty of the citizen as guaranteed by the Constitution." *Yee Gee v. City and County of San Francisco*, 235 Fed. 757, 759.

It is contended by respondents that it is necessary to limit the hours that a barber may labor, in order to prevent fatigue, with its consequent hazards to the general public. It will be observed that the ordi-

nance does not by its terms limit the hours of labor at all, but merely attempts to limit the time *within which a shop may be kept open*. If a shop remained open twenty hours of the day, working two shifts of ten hours each, or kept open twenty-four hours of the day, working three shifts of eight hours each, or four shifts of six hours each, there would be no violation of any regulation as to the *hours* of labor.

It may be true, as suggested in the testimony of some of the witnesses, that the enforcement of the ordinance would serve to deflect a portion of appellant's business to other shops of the city, and thus secure a fairer division. But that result, even though it should follow, is, in our opinion, no valid reason for compulsory interference with the lawful business of the individual. If the principle thus contended for be upheld, then the city council could limit the opening and closing hours of shops to any period that it saw fit, with the view of equalizing the incomes of all. Such legislation, if upheld, might be the first installment of a plan or system by which all shops would be required to pool their revenues for equal division. In our opinion, the provisions of the ordinance requiring the shops to close at specified hours bear no reasonable relation to the public health or general welfare. The evidence in the case upon which the findings of the court were based rests upon conjecture, and not upon anything of a substantial nature.

It is suggested by respondents in their brief that the closing of the shops at an early hour would facilitate inspection by the authorities and members of the board of inspection. But certainly ample opportunity now exists for reasonable inspection, and certainly the situation does not call for an absolute closing of the shops in order that inspectors may go upon the premises; otherwise, the right of inspection

would not be an incident of regulation, but would be a lever by means of which the business would be largely controlled.

The following cases have been called to our attention, involving ordinances containing provisions practically identical with those with which we are here concerned: *Falco v. Atlantic City,* 99 N. J. Law 19, 122 Atl. 610; *Chaires v. City of Atlanta,* 164 Ga. 755, 139 S. E. 559, 55 A. L. R. 230; *State ex rel. Newman v. Laramie,* 40 Wyo. 74, 275 Pac. 106; *City of Alexandria v. Hall,* 171 La. 595, 131 So. 722; *Knight v. Johns,* 161 Miss. 519, 137 So. 509; *McDermott v. City of Seattle,* 4 Fed. Supp. 855.

The first of these cases supports the contention of the respondents. The remaining five hold the ordinances in question either unconstitutional or else unreasonable and void. The cases differ somewhat in their reasoning and in the grounds on which their conclusions are rested. All, however, reach the same result. We have hereinabove adopted some of the statements made in several of them, and therefore will not take further space in analyzing or quoting from them.

We are of the view that the provisions of the ordinance relating to the hours of opening and closing barber shops are unreasonable and arbitrary, and consequently void. The decree of the trial court is therefore reversed, with direction to enter in its place a decree permanently enjoining the enforcement of the ordinance to the extent last mentioned.

BEALS, C. J., MAIN, MITCHELL, and TOLMAN, JJ., concur.

BLAKE, J. (dissenting).—Legislation such as the ordinance here under consideration finds its origin in Sunday closing laws and laws regulating the use of intoxicating liquor. Sunday closing laws have gen-

erally been upheld, not so much on the theory of religious observance of the Sabbath day as upon the theory that one day of rest during the week is essential to man's physical and moral well being. In *Soon Hing v. Crowley*, 113 U. S. 703, 5 S. Ct. 730, Mr. Justice Field said:

"Laws setting aside Sunday as a day of rest are upheld, not from any right of the government to legislate for the promotion of religious observances, but from its right to protect all persons from the physical and moral debasement which comes from uninterrupted labor. Such laws have always been deemed beneficent and merciful laws, especially to the poor and dependent, to the laborers in our factories and workshops and in the heated rooms of our cities; and their validity has been sustained by the highest courts of the States."

Intoxicating liquor has always been recognized as deleterious to the public welfare. Traffic in it has not only been subject to Sunday closing laws, but also to limitation, on week days, of the hours during which it might be conducted. Laws regulating opening . and closing hours of saloons have been universally upheld. Not only that—long ago, an ordinance was upheld requiring restaurants where intoxicating liquor was sold to remain closed after ten p. m. *State v. Freeman*, 38 N. H. 426. In that case, the court said:

"The objection is that the ordinance deprives the citizen of the right guaranteed to him by the constitution, of 'acquiring' 'property' by the prosecution of a lawful business.

"It is an unavoidable consequence of city ordinances, that they in some degree interfere with the unlimited exercise of private rights which were previously enjoyed. It is one thing to deprive a party of his rights, and quite another to regulate and restrain their exercise in such a manner as the common convenience and safety may require. If it is permissible

to interfere in any way with the private right to carry on and manage his lawful business at such time and place, and in such manner as suits himself, we are unable to see anything unreasonable in requiring places of public entertainment to be closed at seasonable hours. The guaranty of the constitution is just as effective to secure the citizen against the interference of the legislature, as of the city council, and it has never been questioned that the legislature may constitutionally pass laws materially interfering with the business of individuals.''

So far as I am aware, the first legislation regulating opening and closing hours of a so-called strictly legitimate business to reach courts of last resort was the Chinese laundry ordinance of San Francisco. This ordinance was passed at the behest of white laundry owners to curb Chinese competition. The pretext upon which it was passed and upheld was to reduce fire hazard at night within certain specified boundaries of the city. Anyone at all familiar with San Francisco, however, will recognize that Chinatown was carefully circumscribed by the boundaries. The ordinance received the attention of the supreme court of the United States in *Barbier v. Connolly*, 113 U. S. 27, 5 S. Ct. 357, and *Soon Hing v. Crowley*, 113 U. S. 703, 5 S. Ct. 730. Mr. Justice Field spoke for a unanimous court in both cases. In the former case, he said:

''The Fourteenth Amendment, in declaring that no State 'shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws,' undoubtedly intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness and acquire and enjoy property; that they should have like access to the

courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of any one except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition, and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed to all for like offences. *But neither the amendment—broad and comprehensive as it is—nor any other amendment, was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity.*"

In the second case, he said:

"The objection that the fourth section is void on the ground that it deprives a man of the right to work at all times is equally without force. However broad the right of every one to follow such calling and employ his time as he may judge most conducive to his interests, it must be exercised subject to such general rules as are adopted by society for the common welfare. All sorts of restrictions are imposed upon the actions of men notwithstanding the liberty which is guaranteed to each. It is liberty regulated by just and impartial laws. Parties, for example, are free to make any contracts they choose for a lawful purpose, but society says what contracts shall be in writing and what may be verbally made, and on what days they may be executed, and how long they may be enforced if their terms are not complied with. So, too, with the hours of labor. On few subjects has there been more regulation. How many hours shall constitute a day's work in the absence of contract, at what time shops in our cities shall close at night, are constant subjects of legislation."

Upon the authority of these cases, ordinances prescribing the hours of opening and closing of pawnshops, second hand stores, pool halls and billiard and soft drink parlors have been held constitutional. *Hyman v. Boldrick,* 153 Ky. 77, 154 S. W. 369, 44 L. R. A. (N. S.) 1039; *Churchill v. Albany,* 65 Ore. 442, 133 Pac. 632, Ann. Cas. 1915A, 1094; *Butte v. Paltrovich,* 30 Mont. 18, 75 Pac. 521, 104 Am. St. 698. In the latter case, the court said:

"It is of the very essence of the exercise of police powers that citizens may, for the public good, be constrained in their conduct with reference to matters in themselves lawful and right. (*Hopper v. Stack,* 69 N. J. Law, 562, 56 Atl. 1.) It is not a material inquiry to attempt to ascertain the reason which impelled the legislature to designate the business of pawnbrokers as subject to police regulations. It is sufficient for us to know that it has done so, and deal with the law as we find it.

"The fact that appellant cannot prosecute his business whenever he may desire to do so is hardly a sufficient reason for saying that the restrictions imposed are unreasonable. However comprehensive the terms 'individual liberty,' so frequently made use of, are, and however broad the claim which may be advanced that everyone may employ his time in a lawful undertaking as may best serve his own interests, still the liberty referred to is a relative term, and, at most, means liberty regulated by just and impartial laws, while all sorts of reasonable restrictions are imposed upon the actions of men for the common welfare and good of society."

In recent years, a number of attempts have been made by municipalities to regulate the hours of opening and closing of barber shops. In all but one instance, these ordinances have been held to constitute an unlawful interference with private business. The case which makes the exception, however, is the only one which, in all of its aspects, is identical with the

case at bar. *Falco v. Atlantic City,* 99 N. J. Law 19, 122 Atl. 610. There, as here, the ordinance was predicated on a statute similar to chapter 120, Laws of 1933, p. 448, Rem. 1934 Sup., § 9213-2 [P. C. § 427g]. While legally the statute mentioned means nothing in the way of supplementing the police power of the city of Bellingham, it means much as a declaration of public policy by the people of the state acting through their legislature. On this aspect of our problem, what Mr. Justice Holmes said in his dissenting opinion in *Lochner v. New York,* 198 U. S. 45, 25 S. Ct. 539, is peculiarly pertinent—the more so since the philosophy of his dissent has come to be well nigh universally accepted:

"This case is decided upon an economic theory which a large part of the country does not entertain. If it were a question whether I agreed with that theory, I should desire to study it further and long before making up my mind. But I do not conceive that to be my duty, because I strongly believe that my agreement or disagreement has nothing to do with the right of a majority to embody their opinions in law. It is settled by various decisions of this court that state constitutions and state laws may regulate life in many ways which we as legislators might think as injudicious or if you like as tyrannical as this, and which equally with this interfere with the liberty to contract. . . . Some of these laws embody convictions or prejudices which judges are likely to share. Some may not. But a constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the State or of *laissez faire.* It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar or novel and even shocking ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States. . . . It does not need research to show that no such sweeping condemnation can be passed upon the statute

before us. A reasonable man might think it a proper measure on the score of health. Men whom I certainly could not pronounce unreasonable would uphold it as a first instalment of a general regulation of the hours of work. Whether in the latter aspect it would be open to the charge of inequality I think it unnecessary to discuss."

The significance of a statutory background for such ordinances as we have here is pointed out in *State ex rel. Newman v. Laramie,* 40 Wyo. 74, 275 Pac. 106, where there was no legislative sanction for the ordinance involved. Distinguishing, for that reason, *Falco v. Atlantic City, supra,* the court said:

"In the case relied on the statute plainly granted to the city the right to fix hours of closing. The court thought it probable that this had been done in order to permit the city to make ready and adequate inspections that might otherwise be inconvenient, difficult or even impossible. In the case at bar, the city's power to fix closing hours does not arise from such a specific grant, and must exist, if at all, as an incident to the power to regulate."

It is true that the pretext for upholding the ordinance in the *Falco* case was a specious necessity for inspection of barber shops to protect patrons against unsanitary conditions—just as the pretext for upholding the laundry ordinance in the *Barbier* and *Soon Hing* cases was fire protection. But I think there was a broader and much more substantial ground for upholding the ordinance in each instance. One cannot read the *Soon Hing* and *Barbier* cases without being convinced that the purpose of the ordinance was to curb a competition in the laundry business under which white men could not live on a standard of decency.

So here, looking through the pretext and at the reality, the purpose of this ordinance is to curb competition of the chain store character in the barber trade.

And it is every whit as justifiable as the laundry ordinance. The chain shops, by working two or three shifts, can keep open twelve, sixteen or twenty-four hours. In order to live, the one or two chair shops must keep open for a like period. Thus through economic necessity, men in the latter shops are forced to work for a length of hours that deprives them of the leisure that makes life worth living. The power of the government to enact legislation to alleviate such conditions is inherent. Such legislation is grounded in the government's "right to protect all persons from the physical and moral debasement of uninterrupted labor." *Soon Hing v. Crowley, supra.*

And when the government speaks on such a question through its legislative authority, the courts have no right or power to interfere, except in case the legislative action is arbitrary or capricious. As was said in *Butte v. Paltrovich, supra*:

"However, the question of the reasonableness of the regulation is one of fact, of which the city council is the best judge, (*Staates v. Borough of Washington,* 44 N. J. Law, 605, 43 Am. Rep. 402; *City of Grand Rapids v. Braudy,* 105 Mich. 670, 64 N. W. 29, 32 L. R. A. 119, 55 Am. St. Rep. 472), and in the absence of a clear showing to the contrary, its reasonableness will be presumed. (*Ivins v. Inhabitants of Trenton,* 68 N. J. Law, 501, 53 Atl. 202.)"

The ordinance here in question permits shops to be open ten hours a day. I find nothing in this record which overcomes the presumption of reasonableness of the regulation. I know of no one, except, perhaps, the extremely acquisitive, who voluntarily works at any kind of labor for more than ten hours a day. Certainly, no one from choice works at manual labor for such an uninterrupted period. While cases involving the exercise of the police power with respect to hours of labor are not harmonious, I think this rule may be fairly

deduced from them: That, where a business is in any respect subject to governmental regulation, hours of labor in connecton with it are a proper subject for reasonable limitation under the police power.

I think the ordinance is a reasonable exercise of its police power by the city, and that the judgment should, therefore, be affirmed.

HOLCOMB, J., concurs with BLAKE, J.

MILLARD, J. (dissenting).—As I read the ordinance, I see only one purpose, the limiting of the hours of labor. However objectionable such interference with a lawful business may be, it is a legitimate exercise of the police power.

GERAGHTY, J. (dissenting)—While dissenting from the majority opinion, I must in candor concede that, if the validity of the ordinance here challenged is to be tested by the weight of past judicial opinion, the conclusion must be against the ordinance. But the ordinance rests for support upon the police power of the state—that all-pervading power to govern men and things which is to be described rather than defined, and whose boundaries the courts have always declined to fix. Happily, the spirit of our laws is not immobility, like those of the Medes and Persians, which never changed, but rather evolution and progress. While I concede the weight of past judicial opinion to be with the majority, yet all the cases upon the exercise of the police power that can be cited have implicit in them the suggestion that they are not the ultimate, but that changed times and the general acceptance of other concepts of public welfare may require new standards and an enlarged exercise of the power.

Any government that is to survive must have within it the possibility of progress and development. No

better characterization of the evolutionary process in the exercise of the police power is to be found than that expressed by Judge Chadwick in *State v. Mountain Timber Co.,* 75 Wash. 581, 135 Pac. 645, L. R. A. 1917D, 10, where he said:

"Having in mind the sovereignty of the state, it would be folly to define the term [the police power]. To define is to limit that which from the nature of things cannot be limited, but which is rather to be adjusted to conditions touching the common welfare, when covered by legislative enactments. The police power is to the public what the law of necessity is to the individual. It is comprehended in the maxim *salus populi suprema lex.* It is not a rule, it is an evolution."

It is often said that the police power overrides the constitution. This is not an accurate expression of the relation of the one to the other. The police power is an essential attribute of the state's sovereignty, and the right to its exercise inheres in the constitution itself. Every proper exercise of the power is in conformity with the constitution.

The ordinance was passed by the city council of Bellingham, pursuant to the provisions of chapter 120, of the Laws of 1933, p. 448, Rem. 1934 Sup., § 9213-2 [P. C. § 427g]. As the cities of the state had already possessed the police power, as ample within its limits as that possessed by the legislature itself, it may be said that this law adds nothing to the power of the city. It may be true in one sense that, by this law, the cities received no accession of power, but in another view the ordinance finds support in the statute, because its passage by the legislature was a finding by the highest authority of the existence of a public necessity and a preponderant opinion justifying the exercise of the police power. To quote again from *State v. Mountain Timber Co., supra:*

"The scope of the police power is to be measured by the legislative will of the people upon questions of public concern, not in acts passed in response to sporadic impulses or exuberant displays of emotion, but in those enacted in affirmance of established usage or of such standards of morality and expediency as have by gradual processes and accepted reason become so fixed as to fairly indicate the better will of the people in their social, industrial and political development."

Can this court now say that the legislative declaration of the existence of a public necessity for the limitation of working hours in the interest of public welfare is not supported by the facts? Judges may not close their eyes and refuse to see what is visible to everyone else.

The appellant asserts his right, in the face of the ordinance, to keep his barber shop open in the city of Bellingham, notwithstanding the fact that members of his trade generally, and the public as well, have accepted the principle of a shorter day. He seeks to keep his shop open in the face of this preponderant opinion in virtue of his claimed right to govern his own business in the manner that appears best to him. But, as a member of organized society, he is presumed to have yielded to government the power to curtail, within limitations, some of his theoretic liberty. To quote from Burke, who plumbed to their depths the principles underlying organized government and social order:

"The moment you abate anything from the full rights of men, each to govern himself, and suffer any artificial, positive limitation upon those rights, from that moment the whole organization of government becomes a consideration of convenience."

And again:

"Government is a contrivance of human wisdom to provide for human wants. Men have a right that these wants should be provided for by this wisdom."

Laws forbidding labor on Sunday have been sustained by the courts, not upon religious considerations, but as being socially and economically necessary and conducive to the common welfare. We have in this state at present an admittedly valid law forbidding the opening of barber shops on Sunday, and a legislative declaration that barbering is not one of the works of necessity permitted on that day. Now, if it is competent for the state, solely upon considerations of common welfare, to forbid the opening of barber shops on Sunday, can it be said that it may not limit them to nine hours on week days, when in the judgment of the legislature public welfare requires it? While the ordinance here involved is in terms one for early closing, its essential purpose is manifestly a shortening of the hours of labor for persons engaged in that trade.

It will not do for courts, by too strict an adherence to precedents having relation to other social and economic conditions, to negative all efforts of the people to improve, through governmental intervention, their social well being. To do so can only bring the courts into disfavor, without staying materially the processes of progress and betterment. Whether for good or evil, we are committed to the theory of democratic government, through whose agency the people must work out their own salvation. In this process, mistakes will be made, but the people must be permitted to make mistakes, if they are to remain free to govern themselves. Recent experience has conclusively demonstrated that, when mistakes are made through ill-considered and hasty legislation, a ready remedy is at hand for their correction.