The inquiry presented is whether the provisions of the ordinance requiring the closing of barber shops in Zanesville before eight o'clock a. m. and after six o'clock p. m. on Monday, Tuesday, Wednesday and Friday, and before eight o'clock a. m. and after twelve o'clock noon on Thursday and before eight o'clock a. m. and after eight o'clock p. m. on Saturday or days (other than Sunday) before certain named holidays, are within a proper exercise of the police power.
The first question requiring attention is the power of the municipality as to local police regulations generally. Section34 of Article II of the Constitution of Ohio provides: "Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employes; and no other provision of the constitution shall impair or limit this power."
In our judgment the word laws does not embrace municipal ordinances and therefore this provision defines the legislative power of the General Assembly of Ohio only. However, under the prevailing constitutional provisions all municipalities derive their power of local self-government and their local police power from the Constitution itself. Village of Perrysburg v.Ridgway, 108 Ohio St. 245, 140 N.E. 595; Village ofStruthers v. Sokol, 108 Ohio St. 263, 140 N.E. 519.
Section 3, Article XVIII, of the Ohio Constitution, *Page 289 
provides: "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."
Section 7 of the same Article provides: "Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of Section 3 of this article, exercise thereunder all powers of local self-government."
Zanesville is a charter or home rule city, and in the exercise of its local police power has the same authority to adopt and enforce ordinances as a city which has not adopted an independent charter, namely, "such local police, sanitary and other similar regulations as are not in conflict with general laws."
Are we confronted with such a conflict in the instant case? The Legislature of this state has passed a regulatory measure relating to barbers. Sections 1081-1 to 1081-27, General Code. This act, however, does not purport to cover hours of labor by barbers or the number of hours in a day or week barber shops may be kept open. This latter field has therefore not been preempted by the state law-making body and the provisions under consideration are not in conflict with general laws.
There is, therefore, no question of the authority of the municipality to pass this legislation provided it is within a proper exercise of the police power.
Under the Fourteenth Amendment of the Federal Constitution neither the state nor the municipality, which is an arm of the state, can "deprive any person of life, liberty, or property, without due process of law." Section 16 of Article I of the Ohio Constitution contains a similar provision in which the words "due course of law" are equivalent in meaning to "due process of law." Salt Creek Valley Turnpike Co. v. Parks,50 Ohio St. 568, at page 579, 35 N.E. 304, *Page 290 
28 L.R.A., 769; State v. French, 71 Ohio St. 186, at page 201,73 N.E. 216, 104 Am. St. Rep., 770. This section of our state Constitution must be read in the light of Sections 1 and 19 of the same article which among other things protect individual liberty and private property.
These constitutional provisions, however, are always subject to a valid exercise of the police power.
The specific problem involved in the instant case as stated by counsel for plaintiff in error in his brief is "whether the ordinance is reasonable and also how far the police power of the state of Ohio and a municipal corporation can go in regulating business hours."
What is said in the recent case of Nebbia v. New York,291 U.S. 502, 54 S.Ct., 505, 78 L.Ed., 940, is pertinent:
"The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often beenheld, demands only that the law shall not be unreasonable,arbitrary or capricious, and that the means selected shall havea real and substantial relation to the object sought to beattained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts. * * *
"The court has repeatedly sustained curtailment of enjoyment of private property, in the public interest. The owner's rights may be subordinated to the needs of other private owners whose pursuits are vital to the paramount interests of the community. * * *
"Laws passed for the suppression of immorality, in *Page 291 the interest of health, to secure fair trade practices, and tosafeguard the interests of depositors in banks, have been foundconsistent with due process. These measures not only affected the use of private property, but also interfered with the right of private contract. Other instances are numerous where valid regulation has restricted the right of contract, while less directly affecting property rights.
"The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned." (Italics ours.)
Conditions and restrictions imposed upon business in the interest of the general welfare have taken many and various forms. State regulation prohibiting entirely manufacture of intoxicating liquor has been held valid. Mugler v. Kansas,123 U.S. 623, 8 S.Ct., 273, 31 L.Ed., 205.
The fixing of hours within which various businesses may be carried on has been upheld: (laundries) Barbier v. Connolly,113 U.S. 27, 5 S.Ct., 357, 28 L.Ed., 923; Soon Hing v.Crowley, 113 U.S. 703, 5 S.Ct., 730, 28 L.Ed., 1145; (pawn shops, secondhand stores, and junk shops) Hyman v. Boldrick,Judge, 153 Ky. 77, 154 S.W. 369; City of Butte v.Paltrovich, 30 Mont. 18, 75 P. 521; (jewelry auctions)Biddles v. Enright, 239 N.Y. 354, 146 N.E. 625, 39 A. L. R., 766; Clein v. Atlanta, 164 Ga. 529, 139 S.E. 46, 53 A. L. R., 933; (soft drink parlors) Churchill v. Albany, 65 Or. 442,133 P. 632, Ann. Cas., 1915A., 1094; (pool and billiard halls)Tarkio v. Cook, 120 Mo., 1, 25 S.W. 202; and (closing barber shops on Sunday) Stanfeal v. State, 78 Ohio St. 24,84 N.E. 419. For other cases see 55 A. L. R., 242.
The right of a state legislature to regulate hours of labor in bakeshops was denied in Lochner v. New *Page 292 York, 198 U.S. 45, 25 S.Ct., 539, 49 L.Ed., 937, but in the case of Bunting v. Oregon, 243 U.S. 426, 37 S.Ct., 435,61 L.Ed., 830, a state law limiting the hours of labor in any mill, factory, or manufacturing establishment was upheld as a valid health regulation. Chief Justice Taft said in his dissenting opinion in Adkins v. Children's Hospital,261 U.S. 525, 43 S.Ct., 394, 67 L.Ed., 785, that he had always supposed that the Bunting case overruled the Lochner case subsilentio.
Enough authority has been cited to make it plain that hours of business as well as hours of labor may be regulated and restricted in proper cases in the lawful exercise of the police power.
It is next in order to turn to provisions relating to barber shops. It seems to be universally conceded by the courts that the barber trade may be licensed and inspected in the interest of public health and many cases are collected upholding provisions of this character as constitutional and within the police power in 20 A. L. R., 1111, and 98 A. L. R., 1089.
In the case of People v. Logan, 284 Ill. 83, 119 N.E. 913, it is said: "The trade of a barber brings him in direct contact with the persons of his patrons, and careless and unsanitary practices in his trade may induce diseases of the skin. Sycosis (popularly known as barber's itch) is a common form of disease of the face and scalp propagated by the use of infected razors and brushes. Other and more serious diseases may also be similarly spread. It cannot be said that the reasonable regulation of the trade of a barber has no relation to the health and safety of the public. Such regulation is therefore within the scope of the police power which the State inherently possesses to restrain and control the exercise of private rights in such manner as may be necessary and appropriate to promote the public health, safety and welfare."
While it is well settled that the barber trade has a *Page 293 
relation to public health and safety and may be regulated, yet in the instant case the contention is that the restriction of the hours barber shops may be open goes too far and so constitutes an unjustifiable interference with private rights. In many states it has been held that laws or ordinances which go beyond licensing and inspecting barber shops and limit the hours of business, are not within the valid exercise of the police power. Ganley v. Claeys, 2 Cal.2d 266,40 P.2d 817; City of Alexandria v. Hall, 171 La. 595, 131 So. 722;Chaires v. City of Atlanta, 164 Ga. 755, 139 S.E. 559, 55 A.L.R., 230; Knight, Chief of Police, v. Johns, 161 Miss. 519,137 So. 509; State, ex rel. Newman, v. City of Laramie, 40 Wy., 74, 275 P. 106; McDermott v. City of Seattle,4 F. Supp., 855; Patton v. City of Bellingham, 179 Wn. 566,38 P.2d 364, 98 A. L. R., 1076; State, ex rel. Pavlik, v.Johannes (Minn.), 259 N.W. 537.
These decisions in the main are based upon the theory that the legislation constitutes an unreasonable attempt to regulate lawful private business and limit the use of private property and has no proper relation to public health and sanitation. These views are grounded on the assertion that barber shops are sufficiently regulated and cleanliness secured by requiring certain standards through licensing and inspection. In two of these cases, Patton v. City of Bellingham, supra, decided December 6, 1934, and State, ex rel. Pavlik, v. Johannes,supra, decided March 15, 1935, there are vigorous dissenting opinions.
In Patton v. Bellingham, Blake, J., in his dissenting opinion, said at page 582: "* * * looking through the pretext and at the reality, the purpose of this ordinance is to curb competition of the chain store character in the barber trade. And it is every whit as justifiable as the laundry ordinance. The chain shops, by working two or three shifts, can keep open twelve, sixteen or twenty-four hours. In order to live, the *Page 294 
one or two chair shops must keep open for a like period. Thus through economic necessity, men in the latter shops are forced to work for a length of hours that deprives them of the leisure that makes life worth living. The power of the government to enact legislation to alleviate such conditions is inherent. Such legislation is grounded in the government's 'right to protect all persons from the physical and moral debasement of uninterrupted labor.' "
Some of these dissenting opinions emphasize the idea that barber shop closing ordinances are merely regulations of the hours of labor. There is more substance to this concept than appears at first blush. Barbering is not just like any other business. To merely limit the number of hours per day that a barber may be employed is to fail to protect other shops and especially the one-man shop against the evils arising from chain and all-night barber shops. Better be it said that fixing the hours the shop shall remain open may be to the legislative mind the only effective way to regulate hours of labor in this trade.
In Falco, Prosecutor, v. Atlantic City, 99 N.J.L. 19,122 A. 610, an ordinance requiring barber shops to close at nine o'clock p. m. on Saturdays and at eight o'clock p. m. on the week days was held valid. In the course of the opinion it is said: "It seems probable that one reason for the legislation upon which it rests was to enable municipal authorities to fix a definite time within which their inspectors might readily and adequately perform their duties with respect to such places. Barber shops are public places, frequented by all classes. Sanitary supervision thereof is very generally regarded as necessary and powers conferred to that end should receive liberal construction so that they may be rendered effective. * * * To allow barber shops to remain open to the public at all hours of the night might well be regarded as rendering ready and adequate inspection inconvenient or difficult or *Page 295 
even impossible, and consequently detrimental to public health. Such considerations are for the fair determination of the municipal authorities, and we cannot say that the regulation in the instant case is unreasonable."
We do not regard this reasoning as "specious," especially in view of the fact that some barber shops are kept open only at night; and this suggestion leads us naturally to the consideration of another phase of the matter.
The judge of the municipal court who heard the case below points out in an opinion filed by him that the barbering done outside the hours prescribed by the ordinance was by residents of the city who worked during the day in other callings or at other labor and sought to supplement the earnings thus gained by running barber shops at night. It is apparent to the open mind that one who has toiled all day will not be fully capable of commanding the needed energy and attention to apply means of sanitation, and to answer the demands of cleanliness, which alone can insure the health of the barber's patrons.
Shall this court say to the municipality that regulatory measures are necessary and proper with reference to barber shops, but that none must be adopted which prevents a man who works during the day at other labor from plying the barber trade at night and thus risking the health of his patrons, when he is unfitted through the travail of a day already done to properly perform his duties as a barber?
There is another consideration which appeals to the legislator as well as to the jurist. Barber shops, which are usually respectable, and operated by law-abiding citizens, may become lounging places for the idle and dissipated, and so a menace to minors, and often in our cities the barber shop in front may be a blind for a den of thieves, professional gamblers, and racketeers behind. This situation is well known, and is even a matter *Page 296 
of common knowledge among policemen in our large cities. At the time a certain policy racket man and former bootlegging beer baron, was recently killed in New York City two of his henchmen were shot down in a midnight barber shop of a subway entrance. In the language of the street a "midnight barber shop" is one that keeps open all night. If barber shops may run at all times of the night the number of vicious places of this character will inevitably be augmented. If similar evils may be thwarted by legislation fixing hours that billiard and pool rooms may remain open, why should not the remedy of municipal legislation be applied in the case of barber shops? Such an ordinance therefore has a relation to public morals and safety.
In our judgment this court should not confine the police power within such limits that the public cannot be protected in any case when there seems to be a reasonable basis for exercising the legislative purpose to protect the public health, morals and safety. It has been pointed out that the law-making power is primarily the branch of government that should determine the need of such provisions. We quote again from the case of Nebbia v. New York, supra, at page 537: "So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio. * * * With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the *Page 297 
courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power."
We are of the opinion that the provisions of the ordinance under inquiry are neither unreasonable, discriminatory, arbitrary nor capricious, and that they bear a "real and substantial relation" to the object sought to be attained, namely, public health, morals and safety.
Constitutional guaranties must be observed and rights thereunder protected; on the other hand the rights of the public or a considerable part thereof must be conserved by restricting, through valid exercise of police power, the individual who seeks to operate his business so as to be a public menace. "Individual liberty" is a comprehensive term but man must be ever mindful that the liberty of one person should end where that of others begins. A business that is harmful to the many may be curbed by legislation within prescribed limitations to prevent the harm; and at the same time the right of property must always remain entitled to protection and subject to reasonable and proper regulation. The police power is not static and must ever be exercised in the light of changing conditions. To continue to apply principles in accord with circumstances no longer existing and to refuse to curtail new evils from fear of demolishing outworn precedents is to close the eyes to the necessities of the times and thus fail to give to constitutional guaranties their true import. Altered social surroundings may impart to long standing constitutional provisions a "new content and new meaning" and require *Page 298 
an application and interpretation previously unthought of. Where new evils detrimental to public health, morals and safety spring up due to the march of civilization, the evils must be met by proper police regulations and such regulations are of necessity within the police power. Such evils have now come to light in the instant case and to deny power to cope with them is to deny the effectiveness of the police power itself.
As we are of the opinion that the ordinance was a valid exercise of the police power, the judgment of the Court of Appeals will be affirmed.
Judgment affirmed.
WEYGANDT, C.J., STEPHENSON, DAY and ZIMMERMAN, JJ., concur.
JONES and MATTHIAS, JJ., dissent.